M.C., By and Through his parent and next friend, MRS. C., Plaintiff,

v.

**VOLUNTOWN BOARD OF EDUCATION, Defendant.**

**No. 3:97 CV2208GLG.**

United States District Court, D. Connecticut.

Oct. 30, 2000.

David C. Shaw, Andrew Alan Feinstein, Law Offices of David C. Shaw, Hartford, CT, for Plaintiff.

Hugh W. Cuthbertson, Frederick L. Dorsey, Jody Pagano Benbow, Siegel, O'Connor, Schiff & Zangari, New Haven, CT, for Defendant.

## MEMORANDUM DECISION

GOETTEL, District Judge.

This Court's decision of July 26, 1999 was reversed in part and remanded by the Court of Appeals. According to that decision, "the District Court declined to consider whether either of the placements proposed by M.C.'s IEP [Individualized Education Program] for that year—the Learning Center or the ACES Program—was adequate under the IDEA [Individuals with Disabilities Education Act, 20 U.S.C. §§ 1400–1491o] .... [T]he District Court erred by skipping directly to the second step of the *Burlington* test—that is, by failing to consider first whether either of the placements proposed in M.C.'s IEP for the ninth grade, the Learning Center or the ACES Program, was adequate." *M.C. ex rel Mrs. C. v. Voluntown Bd. of Educ.*, 226 F.3d 60, 66–67 (2d Cir.2000). The case was remanded "to determine whether either the Learning Center or the ACES Program would have been an adequate placement for [the plaintiff] in the ninth grade" along with other instructions. *Id.* at 67. An evidentiary hearing has been held by this Court in conformance therewith.

## THE PRIOR PROCEEDINGS

In our earlier decision, we stated that

courts typically apply the two part test set forth in *School Committee of Burlington v. Department of Education of Massachusetts*, 471 U.S. 359, 105 S.Ct. 1996, 85 L.Ed.2d 385 (1985). Under this test, the Court considered whether the public school's proposed placement is proper under the IDEA, and if not, whether the parents' proposed placement is appropriate. 471 U.S. at 369–70, 105 S.Ct. at 1996; *see Florence County Sch. Dist. Four v. Carter*, 510 U.S. 7, 12, 15, 114 S.Ct. 361, 126 L.Ed.2d 284 (1993).

*M.C. ex rel Mrs. C. v. Voluntown Bd. of Educ.*, 56 F.Supp.2d 243, 250 (D.Conn. 1999). We then noted that the case did not fit squarely within the *Burlington* framework in that the Board had initially agreed with the parents' proposal to continue the plaintiff's placement at the Rectory School (a private school which he had attended in the 1996–97 school year) but later withdrew its approval when the Rectory School refused to enter into a contract with it. In light of the fact that the Board had found the Rectory School to have been an appropriate placement for the 1996–97 school year (for which the Hearing Officer required the Board to reimburse the parents), we reviewed the circumstances surrounding the Board's decision to change its position as to the 1997–98 school year. The Hearing Officer had determined that the placement at Rectory was correct for educational purposes. (Hr'g Officer's Final Decision & Order, at 10, Conclusions ¶ 14.) We therefore determined that we need not begin by considering the appropriateness of the Learning Center (also called the Learning Clinic) or the ACES Program, since we found it inconsistent for the Hearing Officer to have ordered the Board to reimburse the parents for the tuition and tutoring costs for the 1996–97 school year and to have found that, except for the contract question, the Rectory School offered an appropriate program for the 1997–98 school year, without finding that the Board's last minute alternative proposal of the Learning Clinic or the ACES Program was inappropriate. We noted that the plaintiff had made exceptional progress in his year at the Rectory School.[1] We further held that the Board's insistence that the Rectory School enter into a contract was not a proper basis for denying an appropriate placement.[2] We held that, under the circumstances, the

Rectory School was the appropriate designation, citing, *inter alia, Florence County School District Four v. Carter*, 510 U.S. 7, 114 S.Ct. 361, 126 L.Ed.2d 284 (1993). *See M.C.*, 56 F.Supp.2d at 256–57.

The Court of Appeals disagreed with that analysis and said that even under *Carter*, the Court must first decide whether the challenged IEP was adequate, so that the holding in *Carter* comes into play only if the answer to this is no. The Hearing Officer's decision held conclusorily that the Board had offered an appropriate program for the 1997–98 year but did not identify whether the appropriate program was the Learning Clinic or the ACES Program at the Norwich Free Academy ("NFA"). (Hr'g Officer's Final Decision & Order, at 9, Conclusions ¶ 4.) The Hearing Officer found, however, that there was insufficient evidence to determine whether the Learning Center offered an appropriate program. (*Id.* at 10, Conclusions ¶ 12.) Indeed, the evidence presented both at the administrative hearing and in the subsequent proceedings in this Court indicated quite clearly that the Learning Center was not appropriate, since it served primarily students with serious emotional problems. There is no evidence that the plaintiff had such serious emotional problems. He had a superior IQ but suffered from a relatively mild attention deficiency disorder.

The Court of Appeals decision directs us to give due weight to the findings of the Hearing Officer. Pertinent to this remand are the following findings of the Hearing Officer. The Norwich Free Academy ("NFA") is a comprehensive regular high school that has an extensive special education program able to meet almost all student needs. It has an alternative edu-

---

1. As noted earlier, the Hearing Officer found that the Rectory School had been an appropriate placement for the 1996–97 school year. Consequently, we granted plaintiff's summary judgment on that issue and that was not a matter pursued on appeal or involved in this remand.

2. While the Second Circuit opinion mentions this holding, it does not indicate whether it agrees with it or not.

cational program (the ACES Program) on campus with about fifty students who are mostly emotionally handicapped.[3] The ACES program is extensively staffed with high academic expectations. (*Id.* at 8, Findings of Fact ¶ 18.) The Hearing Officer further found that the plaintiff was not evaluated at the Learning Clinic as to the suitability of his placement there, since the parents would not release his records.[4] (*Id.* Findings of Fact ¶ 19.)

The Hearing Officer concluded that the plaintiff needed special education in conformance with the stated goals and objectives in his Individual Education Program ("IEP"). She noted that the problems arose when it became apparent that the Rectory School would not sign a contract with the Board concerning the delivery of services pursuant to the plaintiff's IEP. The Board then withdrew its approval of the Rectory School as an appropriate program for the plaintiff. (*Id.* at 9, Conclusions ¶¶ 5, 6.) She held that the Rectory School was "within its rights in refusing such a contract" although its position was "not admirable." (*Id.* Conclusions ¶ 3.) The Hearing Officer also believed that the *Carter* case was not an "accurate analogy" to this case since the Board did offer an appropriate program, originally the Rectory School, and, subsequently, the NFA. (*Id.* at 10, Conclusions ¶¶ 12, 15.) The Hearing Officer found that the Rectory School had done such an excellent job of educating the plaintiff in the preceding year that he was ready, or could be included, in a mainstream program since he was no longer depressed. (That differed from the then-existing IEP. *See* discussion *infra.*)

3. It is unclear whether the Hearing Officer treated the plaintiff's attention deficiency disorder as being an emotional handicap.

4. At the evidentiary hearing on remand, the plaintiff's mother differed with this conclusion on a rather technical basis, but it is uncontested that she opposed sending her son there. Since it was clear from the evidence both at the administrative hearing and at the

The final decision, therefore, as relevant to this proceeding, was that the Board was not responsible for payment for the 1997–98 school year at the Rectory School, where the plaintiff actually attended at his parents' cost, although it was responsible for the previous 1996–97 school year's costs. Consequently, the hearing on remand concerned itself solely with whether or not the parents would be reimbursed for the 1997–98 school year's tuition. (The 1997–98 school year, when the plaintiff was in the ninth grade, was the last year available at the Rectory School, since it operates only through ninth grade.)

In its decision remanding this case, the Court of Appeals noted that

[a]s for the ACES Program at the NFA, there was some dispute over the extent to which the program integrates disabled children with non-disabled children—a factor that is relevant to the inquiry in light of the IDEA's "strong preference for children with disabilities to be educated, to the maximum extent appropriate, together with their non-disabled peers."

*M.C.,* 226 F.3d at 67 (citing *Walczak v. Florida Union Free Sch. Dist.,* 142 F.3d 119, 122 (2d Cir.1998); quoting 20 U.S.C. § 1412(5)(A)).[5]

### THE EVIDENTIARY HEARING

At the evidentiary hearing, the assistant superintendent of the NFA testified, as he had done at the administrative hearing, although he confined his testimony more directly to the Second Circuit's concerns about mainstreaming. He testified that NFA is a high school serving a number of towns and has 2,300 students from those towns. Its ACES Program is in one of the

remand evidentiary hearing that the Learning Clinic would have been inappropriate because it offered no mainstreaming opportunities, we discuss it no further.

5. This integration of disabled students with their non-disabled peers is commonly known as "mainstreaming."

numerous buildings on campus, with five classrooms accommodating small classes of about twelve students per class. NFA offers its physical education program in two gymnasia and also offers a variety of vocational classes at other locations across the campus. Regular education students and students in the ACES program are integrated in the physical education and vocational classes, and also in the lunchroom. Transportation is provided for all students and the learning disabled are not segregated.

In terms of what services the school could have provided had the plaintiff attended there for the 1997–98 school year in question, a difficult problem arises. The IEP in this case required twenty-nine hours of special education, which left insufficient time for physical education and no time for vocational education. (There are approximately thirty hours of class scheduled per week). NFA's assistant superintendent testified that in order to conform with the IEP, the Planning and Placement Team ("PPT") might have had to add additional hours to the plaintiff's schedule, which might have conflicted with transporting him home after school. (Transportation is each home town's responsibility.) However, he indicated that the PPT would have attempted to obtain a clarification from the Voluntown School Board and, if

necessary, hold another planning meeting to change the IEP.[6]

At this point it is worth noting, from the evidence adduced at the hearing, that after the plaintiff completed his second year at the Rectory School (and thereby completed the last grade it offered), he entered the tenth grade at NFA. It does not appear that he has ever been a part of the ACES Program since, apparently, by the time he reached the tenth grade, as the result of the assistance given him at the Rectory School, he had progressed to a point where that level of assistance was no longer necessary. Indeed, his IEP for the 1998–99 school year does not mention or consider the ACES Program and simply indicates that he would need support in special education for four hours a week plus two hours of case coordination. He has apparently done well in that program and is now in his senior year in an academic program making him eligible for college admission. The NFA witness acknowledged, however, that had M.C. attended NFA the year at issue, his education would have been primarily special education in order to comply with the then-existing IEP (unless the IEP was changed).

The plaintiff's mother, who sues in this action as his next friend, also testified. She admitted being adamantly opposed to sending her son to the Learning Center

---

6. The plaintiff contends that he is entitled to judgment in this matter because the entire IEP was illegal from the start since it did not provide sufficiently for mainstreaming the plaintiff. He is possibly correct in this assessment. Courts have looked to a number of factors to indicate whether an IEP is reasonably calculated to provide a meaningful educational benefit under the IDEA, including, *inter alia,* (1) whether the program is individualized on the basis of the student's assessment and performance; and (2) whether the program is administered in the least restrictive environment. *See, e.g., Cypress–Fairbanks Indep. Sch. Dist. v. Michael F. ex rel. Mr. & Mrs. Barry F.,* 118 F.3d 245, 253 (5th Cir.1997). These factors are "derived from and track the federal regulations which implement the IDEA." *Id.* at 253 n. 29.

At the administrative hearing, the Hearing Officer assumed that changes would be made to the IEP to make it conform to the statutory requirements in that regard. The defendant's special education coordinator had testified at the due process hearing that although he might start full time in the ACES Program, the expectation was that as soon as he could handle it he would be mainstreamed.

Even assuming that the IEP was improper *ab initio,* thereby leading to an improper ACES Program recommendation for the plaintiff, we view that issue as having been raised too late. It was not pursued in the original proceedings in this Court and, although Plaintiff's counsel advised us that the issue was raised at oral argument with the Court of Appeals, it certainly is not a part of what has been remanded by the Court of Appeals to this Court.

which she considered completely inappropriate. The plaintiff's mother consulted with her advocate who was familiar with the Learning Center and who advised against her child attending it since it afforded no mainstreaming opportunities. She claimed that she had not learned of the proposed ACES Program until the day of the IEP team meeting (May 27, 1997) when the team determined that the ACES program was the appropriate designation (in place of the Rectory School), which did not allow her or her educational consultant sufficient time to visit the ACES Program since the school was going on summer recess. As noted earlier, in the 1998–99 school year, which is not involved in this case, the defendant did not propose sending the plaintiff to the ACES Program but merely to the NFA to which plaintiff's mother apparently did not object. She was quite familiar with the NFA since her daughter had been attending it for a couple of years at that time, although not in the ACES Program.

### CONCLUSION

We are asked on this remand to determine whether the Learning Center or the ACES Program would have been an adequate placement for M.C. in the ninth grade. As we have stated earlier, the Learning Center would not have been appropriate. It is more difficult to evaluate the ACES Program because, by the time he had completed his second year at the Rectory School, the ACES Program would have provided more assistance than he then required. However, considering where he was at the end of the eighth grade and giving "due weight" to the findings of the Hearing Officer that the ACES Program would have been appropriate for the ninth grade, we must conclude, within the interpretation of the law set down in the Second Circuit opinion (with which we do not agree in light of the unusual facts of

this case outlined above), that the proposal for placement at the ACES Program would have been adequate, although clearly not as desirable as the Rectory School in light of the fact that the plaintiff was already at that school and had done well there.[7]

Under these circumstances, we reluctantly find for the defendant and direct the Clerk to enter judgment on the remand accordingly. That means that the $4,200 for the services of Dr. Gardner are eliminated and the costs of tuition at the Rectory School for the second school year (1997–98) in the amount of $14,825 are not a part of the judgment. In the other respects, not a part of the reversal and remand, this Court's original judgment stands, which is to say, attorney's fees in the amount of $35,081.65. We are not awarding any additional fees for the time spent on appeal or on this remand, but we do not prohibit an application for additional fees if plaintiff wishes to make one. The defendant will of course be allowed to oppose that application.

SO ORDERED.

---

7. It is undisputed that the placement need not be the best, but merely an adequate one in order to satisfy the requirements of the IDEA. *See Walczak,* 142 F.3d at 129 (citing *Bd. of Educ. of Hendrick Hudson Central Sch. Dist. v. Rowley,* 458 U.S. 176, 206–07, 102 S.Ct. 3034, 73 L.Ed.2d 690 (1982)).