245 F.Supp.2d 417 (2001)
A.S., by His Parent and Next Friend P.B.S., Plaintiff,
v.
BOARD OF EDUCATION OF THE TOWN OF WEST HARTFORD, Defendant.
No. 300CV1130 RNC.
United States District Court, D. Connecticut.
August 20, 2001.
*418 Dwight Owen Schweitzer, Miami Beach, FL, for Plaintiff.
U.S. Court of Appeals, Office of the Clerk, New York City, for Notice Only.
Susan C. Freedman, Karen T. Staib, Shipman & Goodwin, Hartford, CT, for Defendant.

RULING ON CROSS-MOTIONS FOR SUMMARY JUDGMENT
CHATIGNY, District Judge.
Plaintiff P.B.S.,[1] parent of A.S., a minor, brings this action pursuant to the Individuals with Disabilities Education Act ("IDEA") against the Board of Education of the Town of West Hartford ("the Board") seeking reimbursement for A.S.'s residential placement at Oxford Academy, a private boarding school, for the summer of 1999 and the 1999-2000 school year. Plaintiff appeals from a hearing officer's determination that she is not entitled to reimbursement because the Board had offered A.S. a free appropriate public education *419 as required under the IDEA. Cross-motions for summary judgment have been filed.[2] For reasons that follow, plaintiffs motion is denied and defendant's motion is granted.

1. The IDEA

The IDEA requires that states receiving federal funds provide "all children with disabilities" with a "free appropriate public education" ("FAPE"). 20 U.S.C. § 1412(a)(1)(A); see also Board of Educ. v. Rowley, 458 U.S. 176, 181, 102 S.Ct. 3034, 73 L.Ed.2d 690 (1982). "This `free appropriate public education' must include `special education and related services' tailored to meet the unique needs of the particular child, 20 U.S.C. § 1401(8), and must be `reasonably calculated to enable the child to receive educational benefits' ...." M.C. ex rel. Mrs. C. v. Voluntown Bd. of Ed., 226 F.3d 60, 62 (2d Cir.2000) (citations omitted).
The particular educational needs of a disabled child and the services required to meet those needs must be set forth at least annually in a written individualized education plan ("IEP"). See 20 U.S.C. § 1414(d)(4)(A)(i). The IEP is formulated by a "PPT Team" composed of, among others, the child's parents, a school official qualified in special education, the child's teacher, and, where appropriate, the child. 20 U.S.C. § 1414(d)(1)(B). "[T]he IEP sets out the child's present educational performance, establishes annual and shortterm objectives for improvements in that performance, and describes the specially designed instruction and services that will enable the child to meet those objectives." Honig v. Doe, 484 U.S. 305, 311, 108 S.Ct. 592, 98 L.Ed.2d 686 (1988); see 20 U.S.C. § 1414(d)(4)(A). The IEP must be reviewed and revised annually. 20 U.S.C. § 1414(d)(4)(A)(i).
In the event a dispute arises between a school board and a parent as to a child's program, either party may request a due process hearing before the state board of education. See Conn. Gen.Stat. § 10-76h(a)(1). The state board then appoints an impartial hearing officer. § 10-76h(c)(1). After the hearing officer makes findings and a decision, an aggrieved party may bring a civil action in state or federal court seeking judicial review of the decision. 20 U.S.C. § 1415(i)(2)(A); Conn. Gen.Stat. § 10-76h(d)(4).

II. Factual Background

A.S. is a 16 year old boy who has been diagnosed with the following disabilities: attention deficit hyperactive disorder ("ADHD"), a specific learning disability ("LD") and serious emotional disturbance ("ED"). There is no dispute that A.S. is a child with a disability as that term is defined under the IDEA. He has been eligible for special educational services under the IDEA since he was diagnosed in second grade (1991-92 school year). A.S.'s educational program has been the subject of a prior due process hearing and two actions in this court. See Mr. J. v. Bd. of Educ., 98 F.Supp.2d 226 (D.Conn.2000) and Doe ex rel. Doe v. West Hartford Bd. of Educ., No. 3:CV99CV765(DJS)(TPS), 2000 WL 557861 (D.Conn. Apr. 3, 2000), and the hearing officer's Final Decision and Order in Case No. 97-267.
The following facts are relevant to the present action. A.S.'s parents did not agree with the Board's plan for A.S. for the 1996-97 academic year. At his own expense, A.S.'s father[3] unilaterally placed *420 him at a private residential school, the Devereux Glenholme Treatment Center ("Devereux"), just before his seventh grade year. (Administrative Record "AR" Ex. 52 at 3 ¶ 2.) Devereux provides a highly structured residential program, the primary goal of which is behavior modification. (Doc. #47 at 1.) The school has a rigid behavior management program based on a token economy system whereby a token can be earned every 15 minutes.[4]
The parties mediated A.S.'s placement at Devereux and the Board agreed to pay for the "education and clinical program" for the 1996-97 school year and A.S.'s parents agreed to pay the costs of the residential portion of A.S.'s placement at Devereux. (Board Ex. 24 ¶¶ 37, 40.)
A.S. participated in an extended year program at Devereux during the summer of 1997 and entered the eighth grade in the 1997-98 school year. The Board agreed to pay for the tuition costs but not the residential component. (Board Ex. 24 ¶ 45.) A.S.'s parents objected and on October 5, 1997 requested a due process hearing. The parents contended that the Board should pay the entire cost of the placement at Devereux for the summer of 1997 and 1997-98 school year because A.S. required a residential placement for educational reasons. (Board Ex. 24 at 3.)
While this due process hearing was ongoing, A.S.'s PPT met on May 15, 1998. (Board Ex. 1a.) During this PPT meeting, Devereux staff reported that A.S., who was then completing eighth grade, was functioning at a 6.6 grade level in Language Arts, a 6.9 grade level in Reading and a 6.7 grade level in Math. Devereux agreed to incorporate into A.S.'s academic objectives certain recommendations made by Dr. Miriam Cherkes-Julkowski, an educational consultant who had evaluated A.S. in November 1997. (Board Ex. 1a at 3-4.)
During this meeting, Glenn McGrath, Director of Pupil Services for West Hartford, recommended to the PPT that the team consider transitioning A.S. in the fall of 1998 into a day treatment program at either the Northwest Village School in Plainville or the Board's off-campus program. (Board Ex. 1a at 4; Tr. 6/16/99 at 122-23.) The Devereux staff did not believe that A.S. was ready to transition from Devereux. According to the Devereux staff, A.S. was appropriately placed and was not ready to transition from a 24 hour program. (Board Ex. 1 at 5; Tr. 6/16/99 at 123.) The Devereux staff noted that "while [A.S.] has made gains in his behavioral objectives, he is still exhibiting these [problem] behaviors in the moderately frequent to quite often range, demonstrating his reliance on the Motivational Management Approach to maintain appropriate behavior." (Board Ex. 1 at 4). The Devereux staff thought that transitioning A.S. should occur after he made further progress, and that he should be informed that he could change schools once he made sufficient progress toward his goals and objectives. (Board Ex. 1 at 5.) A.S. remained at Devereux through the summer of 1998.
*421 On June 16, 1998, the hearing officer issued a Final Decision and Order in Case No. 97-267. (Board Ex. 24 at 3-22.) The hearing officer granted A.S.'s request for reimbursement for the residential costs of A.S.'s 1997 summer program and 1997-98 school year at Devereux. However, the hearing officer expressed concern regarding the impact of continued residential placement on A.S.'s ability to adapt to community living:
if [A.S.'s] need for residential placement continues indefinitely he will one day awaken to the reality that he has learned to become a good institutional patient but lacks the psychological, social and academic skills to effectively cope with the developmental tasks of daily living. Future IEPs for [A.S.] must contain detailed transitional components indicating how [A.S.] will be rehabilitated into community living. A day treatment program may or may not be the appropriate placement for [A.S.]. All options need to be explored, including placement in one of the Board's high schools with appropriate support services.
(Board Ex. 24 at 21 ¶ 5.) The hearing officer ordered that "[t]he Board shall convene a PPT meeting to review A.S.'s status and current functioning and to plan an IEP for him for the summer of 1998 and the 1998-99 school year. Such IEP shall not be inconsistent with the findings and conclusions herein." (Board Ex. 24 at 21.)
A.S. entered ninth grade at Devereux in the fall semester of the 1998-99 school year.
On September 18, 1998, the PPT met for the first time after the hearing officer issued his decision. (Board Ex. 10.) The purpose of the meeting was to comply with the hearing officer's directive that the PPT develop a plan to transition A.S. into community living. (Board Ex. 10 at 2.) The team agreed that A.S. should have a speech and language evaluation as had been recommended by Dr. Cherkes-Julkowski. The team also reviewed A.S.'s academic progress. (Board Ex. 10 at 2.) The Devereux staff reported that since May, A.S.'s grade level in Language Arts had increased from 6.6. to 6.8, his grade level in Reading had increased from 6.9 to 7.1, and his grade level in Math had increased from 6.7 to 6.9. (Board Ex. 10 at 2.) The Devereux staff thought it possible that A.S. would be ready to transition from Devereux for the second semester. (Board Ex. 10 at 4.) They agreed to reconvene in November to review A.S.'s progress on his IEP and to develop a transitional plan. (Board Ex. 10 at 4.)
At the request of the PPT, Patricia Auber of the Department of Pupil Services for the West Hartford school district conducted a comprehensive speech and language evaluation in November 1998. (Board Ex. 16.) She recommended that complex oral instructions be broken down, communicated to A.S. in short sentences and at a slow pace with strong intonation to emphasize critical points. She further noted that "A.S.'s impulsive response style may cause difficulty for him socially" and advised that "counseling should continue to address [A.S.'s] social language issues.... He needs to be taught skills for appropriate interaction." (Board Ex. 16 at 4-5.)
The PPT met again on November 20, 1998. (Board Ex. 17.) The purpose of this meeting was "to examine [A.S.'s] academic and behavioral performance/progress to develop a transitional plan which will support [A.S.'s] reentry to his educational program at Hall High School." (Board Ex. 17 at 1.) The Devereux staff reported that A.S. had made "steady progress" toward his behavioral goals. (Board Ex. 18 at 3.) The Devereux staff recommended that A.S. achieve and maintain his *422 behavioral objectives before he could be discharged from Devereux. (Board Ex. 18 at 3.) The PPT discussed the transition issues with specific attention paid to A.S.'s need for small academic classes, academic resource support, individual and family therapy, and a high level of structure and monitoring of his progress. (Board Ex. 17 at 2; Board Ex. 18 at 3.) Mr. McGrath, reported that an appropriate plan could be developed to transition A.S. to Hall High and the team agreed that the Board should develop such a plan. (Board Ex. 17 at 1-2.) A.S.'s father expressed concern about the Hall High proposal. The team agreed that "[A.S.'s] current IEP will remain in effect, including his Behavioral Intervention Plan, working toward 97% of Level II....." (Board Ex. 17 at 1.)
On January 7, 1999, A.S. and Sallie Stevens, A.S.'s teacher at Devereux and lead case manager, visited Hall High. (Board Ex. 20 at 1.) They met with McGrath, Dr. Nancy DePalma, who would have been A.S.'s guidance counselor at Hall High, and Jack Edmunds, a special education teacher at Hall High who would have been A.S.'s case manager. (Tr. 8/26/99 at 17-18.)
The Board created a plan to transition A.S. from Devereux to Hall High for the second semester. (Board Ex. 20.) The proposed curriculum consisted of classes in Earth Science, English, World History, Mathematics and Learning Strategies, all of which were to be special education courses conducted by a certified special education teacher and a teaching assistant in classrooms that had no more than 15 students. (Board Ex. 20; Tr. 8/26/99 at 22, 23-26.) Under this curriculum, A.S. would receive 225 minutes of instruction per day. (Board Ex. 20; Tr. 8/26/99 at 25.) In addition, he would receive individual counseling with a school psychologist; family counseling; academic resource support and speech/language consultation; Alpha Smart, a word processing tool for note taking; home tutoring; and exploration of vocational work experience or extracurricular activities. (Board Ex. 17 at 2, Board Ex. 20.) The Board would closely monitor A.S.'s program and the PPT would reevaluate A.S.'s program at Hall High within two weeks of his enrollment. (Board Ex. 23 at 2.) The PPT was scheduled to meet on January 15, 1999 to review A.S.'s academic and behavioral performance, to determine appropriate modification to his IEP and to complete his transitional planning for his program and placement at Hall High. (Board Ex. 20 at 1.) The meeting, however, did not take place and the PPT did not meet until February 5, 1999. A.S. remained at Devereux during this time.
At the February 5 PPT meeting, Devereux staff reported that A.S. was ready to transfer to a less restrictive environment. (Board Ex. 26 at 2.) Sallie Stevens reported that A.S. had continued to make good academic progress. (Board Ex. 23 at 2.) Themis Enright, A.S.'s social worker, reported that A.S. had met and exceeded his behavioral benchmarks and that A.S. had expressed disappointment that he had not been discharged from Devereux in January. (Board Ex. 23 at 2.) A.S.'s father disagreed with the plan to transition A.S. to Hall High. (Board Ex. 23 at 2.) He felt that A.S. needed to continue in a residential placement and that the Board's plan offered inadequate structure, individualization and support. (Board Ex. 23 at 2.) A.S.'s father presented the PPT with a transition plan proposing that A.S. be placed at Oxford Academy in Westbrook, Connecticut, a private, non-special education, all male boarding school. (Parent Ex. 4.) Students at Oxford Academy are taught in 20 minute one-on-one tutorials for a total of 80 minutes of instruction per day. The tutorial sessions are followed by *423 a supervised study hall. (Tr. 10/12/99 at 8-12.) The parent's transition plan included Dr. Cherkes-Julkowski's November 17, 1997 evaluation of A.S., Oxford Academy's brochure, and a letter dated February 1, 1999 from Dr. Cherkes-Julkowski. In the letter, Dr. Cherkes-Julkowski opined that based on her earlier evaluation of A.S. and a review of the school's brochure, it "appear[s] that Oxford's main emphasis is exactly that kind of individual instruction and would be appropriate for him." (Board Ex. 22.) At the time, Dr. Cherkes-Julkowski had not seen A.S. since her November 1997 evaluation and neither she nor A.S.'s parents had visited Oxford Academy. (Tr. 10/4799 at 76; Tr. 10/15/99 at 75.) In view of the competing proposed placements, the PPT was unable to reach consensus. At the conclusion of the February 5, 1999 PPT, a "stay put" was instituted.[5] (Board Ex. 23 at 1.)
In March 1999, Robin Antonucci, a special education teacher at Hall High, conducted an educational evaluation using the Woodcock-Johnson Psychological Battery. (Board Ex. 32.) She concluded that "[A.S.] will find the performance demands of age-level tasks involving Broad Reading easy; age-level tasks involving Broad Knowledge will be manageable; age-level tasks involving Broad Written Language will be difficult; age-level tasks involving Broad Mathematics will be very difficult for him." (Board Ex. 32 at 3.)
Also in March, Dr. Frank Morisano, a school psychologist for the West Hartford school district, assessed A.S.'s basic academic skills using the Wechsler Individual Assessment Test ("WIAT"). (Tr. 8/24/99 at 115.) A.S. scored in the 45th percentile compared with students his age in Reading; 2nd percentile in Numerical Operations; 42nd percentile in Mathematics Reasoning; and 7th percentile in Written Expression. (Board Ex. 33 at 3.)
The PPT reconvened on April 6, 1999. (Board Ex. 34.) The team reviewed the evaluations conducted by Ms. Antonucci and Dr. Morisano as well as A.S.'s performance at Devereux. (Board Ex. 34 at 2.) The Devereux staff reported that A.S.
continues to make steady and significant progress towards his behavioral, residential and therapy objectives portion of his treatment program. He has reached the Phase I level since his last review and has been able to successfully maintain this level for 8 weeks. Phase 1 is the level where the child requires the least amount of structure to maintain appropriate behavior. Staff and teachers that work closely with [A.S.] report that he continues to have age appropriate interactions with his peers.... He continues to demonstrate a strong ability to accept responsibility for his actions and has shown a great deal of maturation in his interactions with his peers and adults.... He has been traveling home every weekend.... [A.S.'s father] has indicated ... [A.S.'s] weekend visits have been going well.
(Board Ex. 35 at 3).
During this meeting, Glenn McGrath described to the PPT his March 6, 1999 visit to Oxford Academy with A.S.'s father. (Board Ex. 34 at 2.) He expressed concern "that the program was too restrictive and that no special education services or staff are available." (Board Ex. 34 at 2.) He believed the Board could provide A.S. with a program including the necessary support *424 A.S.'s father did not agree. The PPT again was unable to reach a consensus for planning a transition to an appropriate educational program. On April 7, 1999, the Board formally requested a due process hearing. (Board Ex. 6.)
On May 1, 1999, A.S. reached the "self dependent" level of the token economy at Devereux. (Board Ex. 41 at 2.)
At the request of the Board, the PPT convened on May 21, 1999. (Board Ex. 41 at 4.) The purpose of this meeting was to "review A.S.'s academic and social/behavioral performance during the 4th quarter and determine summer school programming to support his transition." (Board Ex. 41 at 2.) The Board presented three options for a six week summer program for A.S. to support his transition to living at home and attending Hall High:
1. Pre-Algebra course: academic tutoring (10 hours), counseling two times a week (2 hours);
2. Elective course (i.e., art): academic tutoring (10 hours), counseling two times per week (2 hours);
3. Tutorial 4 hours per day (20 hours per week) and counseling two times per week (2 hours).
(Board Ex. 41 at 2.) A.S.'s father rejected the Board's proposal for a summer program and instead requested that the Board assume the expense of a program for the summer of 1999 for A.S. at Oxford Academy. (Board Ex. 41 at 2.) The Board declined to do so.
In June 1999, A.S. graduated from Devereux. A.S.'s father unilaterally enrolled A.S. in a summer program at Oxford Academy. (Board Ex. 41 at 5.) While the underlying due process hearing was ongoing, A.S. remained at Oxford Academy for the 1999-2000 academic year. A.S.'s placement at Oxford Academy for the summer of 1999 and the 1999-2000 academic year is the subject of the present action.[6]

A. The Hearing Officer's Decision

On May 10, 2000, having heard 12 days[7] of testimony from 11 witnesses[8] totaling over 1500 pages of transcript, the hearing officer issued the Final Decision and Order in Case No. 99-065 finding in favor of the Board.[9] (AR Ex. 52.) The hearing officer framed the issues as follows:
1. Does the Board's transition plan to Hall High School with supported services provide the student with a free and appropriate public education?
2. If not, is the parent's unilateral placement at Oxford Academy an appropriate placement?
*425 The hearing officer noted the concern raised by the hearing officer in the previous due process hearing "that the student's continued placement in [a] residential program would cause the student to `lack the psychological, social and academic skills to effectively cope with the developmental tasks of daily living.'" (AR Ex. 52 at 3 ¶ 3.) The hearing officer found that although A.S.'s residential placement at Devereux initially was due to his disability of serious emotional disturbance, A.S. had progressed and was no longer dependent on the token economy system. (AR 52 at 9 ¶ 7.) The hearing officer concluded that A.S. did not require a residential placement or a therapeutic day program in order to receive an educational benefit. (AR Ex. 52 at 4 at ¶ 9, at 9 ¶ 7.) The hearing officer further found that the Devereux staff supported the Board's recommended placement of A.S. at Hall High. (AR Ex. 52 at 8 ¶ 6.)
The hearing officer concluded that the Board had complied with the procedural safeguards of the IDEA. (AR Ex. 52 at 9 ¶ 6). The hearing officer's final decision and order stated:
1. The Board's transition plan to the High School with supported services will provide the student with a Free and Appropriate Public Education.
2. The Board shall have a summer program for the student as had been proposed at the February 5, 1999 PPT. This program is to assist the student into his transition from residential placement to the Board's High School.
3. The Board does not have to reimburse the parentis] for their unilateral placement of the student.
(AR 52 at 9 at ¶¶ 1-3.)
Having so concluded, the hearing officer did not reach the second issuethat is, whether Oxford Academy was an appropriate placement.

B. Procedural Background

In May 2000, A.S., by his mother and next friend P.B.S., commenced this action in state court alleging that the Board had failed to provide him with a FAPE. On June 19, 2000, defendant removed the action on the basis of federal question jurisdiction under the IDEA. The parties subsequently agreed that the case could be resolved by way of summary judgment and on December 7, 2000, the joint record was filed. On January 16, 2001, the parties filed cross-motions for summary judgment which have been fully briefed.

III. Standard of Review

In IDEA cases federal court, "(i) shall receive the records of the administrative proceedings; (ii) shall hear additional evidence at the request of the party; and (iii) basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate." 20 U.S.C. § 1415(i)(2)(B). The court's role in reviewing state educational decisions under the IDEA is "circumscribed." M.C. ex rel. Mrs. C v. Voluntown Bd. of Ed., 226 F.3d 60, 66 (2d Cir.2000). The Second Circuit has instructed that
[s]uch decisions are subject to independent judicial review ... but this is by no means an invitation to the courts to substitute their own notions of sound educational policy for those of the school authorities which they review.... To the contrary, a federal court is required to give due weight to the rulings of a local or state administrative hearing officer... mindful that the judiciary generally lack[s] the specialized knowledge and experience necessary to resolve persistent and difficult questions of educational policy.... Judicial deference is particularly appropriate when the state *426 hearing officer's review has been thorough and careful.
Id. (citations and internal quotation marks omitted). See Mrs. B v. Milford Bd. of Educ., 103 F.3d 1114, 1121 (2d Cir.1997) ("A court may not second-guess state educators' policy decisions in the effort to maximize a handicapped childs educational potential.").

IV. Discussion

"[P]arents who unilaterally change their child's placement ... without the consent of state or local school officials, do so at their own financial risk." School Committee of Town of Burlington, Mass. v. Department of Educ. of Mass., 471 U.S. 359, 373-74, 105 S.Ct. 1996, 85 L.Ed.2d 385 (1985). However, if parents are ultimately successful in review proceedings, the IDEA permits retroactive recovery of tuition expenses. Id. at 370, 105 S.Ct. 1996.
"[W]hether the parents of a disabled child are entitled to reimbursement for the costs of a private school turns on two distinct questions: first, whether the challenged IEP was adequate to provide the child with a free appropriate public education; and second, whether the private educational services obtained by the parents were appropriate to the child's needs.... If the challenged IEP was adequate, the state has satisfied its obligations under the IDEA and the necessary inquiry is at an end.... Only if a court determines that a challenged IEP was inadequate should it proceed to the second question." M.C. ex rel. Mrs. C. v. Voluntown Bd. of Ed., 226 F.3d 60, 66 (2d Cir.2000) (citations omitted). See Walczak v. Florida Union Free School Dist., 142 F.3d 119, 134 (2d Cir.1998) (holding that because the challenged IEP was adequate, the defendant school board could not "be ordered to reimburse the parents for expenses incurred as a result of their decision to remove their child from the ... program").
In determining whether an IEP was adequate to provide a child with a FAPE, a court must consider: (1) whether the school board complied with the procedural requirements of IDEA, and (2) whether the IEP was reasonably calculated to enable the child to receive educational benefits. See Rowley, 458 U.S. at 206-07, 102 S.Ct. 3034; M.S. ex rel. S.S. v. Board of Educ. of Yonkers, 231 F.3d 96, 102 (2d Cir.2000). "The initial procedural inquiry is no mere formality." M.S., 231 F.3d at 102. "[A]dequate compliance with the procedures prescribed [by IDEA] would in most cases assure much if not all of what Congress wished in the way of substantive content in an IEP." Rowley, 458 U.S. at 206, 102 S.Ct. 3034. An IEP includes a statement of the child's present levels of educational performance; the annual goals for the child, including short-term instructional objectives; the specific educational services to be provided to the child; an explanation of the extent to which the child will not participate with nondisabled children in regular educational programs; any transition services the child needs as he or she begins to leave a school setting; and the projected initiation date and duration of proposed services. 20 U.S.C. § 1414(d)(1)(A).

A. Analysis

[3] Plaintiff claims that the Board failed to offer A.S. a FAPE because an IEP was not in place during A.S.'s 1998-99 school year at Devereux. As to this claim, the hearing officer found that "[t]he parents in their post trial brief raised the issue that an IEP was not in place for the student during the 1998-99 school [year]. This issue was not raised at the Pre-hearing conference or ever presented as an issue for the hearing." (AR Ex. 52 at 7 *427 ¶ 2.) The hearing officer found that upon "examining all the PPTs held from April 1998 to April 1999, there is no record that an IEP was not in place for the student. The April 1999 PPT shows that the student was making gains in his IEP goals and objectives. Therefore, this issue without merit." (AR Ex. 52 at 7 ¶ 2.)
Connecticut state law requires that "no issue may be raised at [a due process] hearing unless it was raised at a[PPT] meeting for such child." Conn. Gen.Stat. § 10-76h(a)(1). "Such a requirement is consistent with, and parallel to, the IDEA requirement that available administrative remedies be exhausted before a special education claim is brought to court. See 20 U.S.C. § 1415(i)." Lillbask ex rel. Mauclaire v. Sergi 117 F.Supp.2d 182, 190 (D.Conn.2000). The documentary evidence and testimony at the due process hearing indicate that the plaintiff did not assert at any PPT meeting that an IEP was not in place. (Tr. 8/24/99 at 32, 50.) Accordingly, this claim has been waived.
Moreover, the record supports the hearing officer's finding that an IEP was in place for the 1998-99 school year. A.S.'s IEP incorporated his Yearly Treatment Plan at Devereux. (Board Ex. 13; Tr. 8/24/99 at 32.) At the November 20, 1998 PPT, the PPT agreed that the 1998-99 IEP, which ran from October 1998 through October 1999, would remain in effect. (Board Ex. 17 at 1.) A.S.'s father attended the PPT and did not object. This IEP was in place when the parties reached an impasse at the February 5, 1999 PPT meeting and A.S. was directed to "stay put.". 20 U.S.C. § 1415(j). The summaries of the PPT meetings conducted after May 1998 reflect that the team regularly discussed A.S.'s progress toward the goals identified in the IEP. The testimony of A.S.'s father on cross-examination bears this out:
Q: And when the Devereux staff went through [A.S.'s] IEP to talk about his progress, you didn't know what that meant either?
A: No, I knew exactly what that meant.
Q: So you were familiar with his IEP? A: Sure.
* * * * * *
Q: [Y]ou understood, and at each of the PPTs [A.S.'s] progress on his IEP goals was reviewed, is that correct? A: Yes.
Q: And during each of the PPT meetings, there was discussion moving towards a transition plan for [A.S.], is that correct?
A: Yes.
(Tr. 10/4/99 at 86-87.)
Plaintiff next claims that the Board failed to establish an appropriate IEP in advance of A.S.'s transition to Hall High. However, the record shows that A.S.'s IEP was developed while he was at Devereux and was "to be carried forward" when he began at Hall High. (Board Ex. 13; Tr. 8/24/99 at 32; Tr. 9/14/99 at 33, 71, 51.) The PPT had planned to meet within two weeks after A.S. entered the Hall High program in order to assess his transition and to make any modifications necessary to his IEP.
Moreover, the record demonstrates that A.S.'s IEP for the 1998-99 academic year met substantive requirements. It set forth his present level of educational performance, included educational evaluations using standardized measurements, outlined annual objectives, measured A.S.'s progress, and outlined teaching materials and strategies. (Tr. 8/24/99 at 75-79.) A.S.'s treatment plan outlined goals that were not confined to Devereux but were intended to be carried forward into his program at Hall High subject to revision *428 thereafter. (Tr. 8/24/99 at 75-79.) For example, in Language Arts, an ongoing goal was for A.S. to develop a paragraph with a topic sentence and three supporting details with 85 accuracy; in Integrated Language, a goal that was identified but not yet introduced was for A.S. to determine fact and opinion in reading with 85% accuracy; and in Mathematics, A.S.'s goals included creating visual representations of all problems involving fractions, decimals and percentages, finding measures of angles, and determining greatest common factors. (Board Ex. 35.) Two of A.S.'s proposed classes did not have established goals (because they had not been offered at Devereux) but this is not fatal. The PPT was to meet before, and again within two weeks after, A.S.'s entry into Hall High.
The gravamen of plaintiffs appeal is that the hearing officer improperly concluded that the Board's recommended placement was reasonably calculated to enable A.S. to receive educational benefits. The following principles are relevant to this issue. An IEP must be designed to produce educational benefits but need not provide a "potential-maximizing" education. See Rowley, 458 U.S. at 197 n. 21, 102 S.Ct. 3034. "The Supreme Court ... has specifically rejected the contention that the `appropriate' education mandated by IDEA requires states to `maximize the potential of handicapped children.' The purpose of the Act was `more to open the door of public education to handicapped children on appropriate terms than to guarantee any particular level of education once inside.' " Walczak v. Florida Union Free School Dist., 142 F.3d 119, 130 (2d Cir.1998) (citations omitted). See Rowley, 458 U.S. at 203, 102 S.Ct. 3034 (State satisfies FAPE "by providing personalized instruction with sufficient support services to permit the child to benefit educationally from that instruction"). "[F]or an IEP to be `reasonably calculated to enable the child to receive educational benefits,' ... it must be `likely to produce progress, not regression.'" M.S. ex rel. S.S. v. Board of Educ. of the City School Dist. of the City of Yonkers, 231 F.3d 96, 103 (2d Cir.2000) (citations and internal quotation marks omitted).
It is therefore necessary to "examine the record for any `objective evidence' indicating whether the child [was] likely to make progress or regress under the proposed plan." Walczak, 142 F.3d at 130 (quoting Mrs. B. v. Milford Bd. of Educ., 103 F.3d 1114, 1121 (2d Cir.1997)). "Courts have looked to a number of factors to indicate whether an IEP is reasonably calculated to provide a meaningful educational benefit under the IDEA, including, inter alia, (1) whether the program is individualized on the basis of the student's assessment and performance; and (2) whether the program is administered in the least restrictive environment." M.C. ex rel. Mrs. C. v. Voluntown Bd. of Educ., 122 F.Supp.2d 289, 292 n. 6 (D.Conn.2000). The "least restrictive environment" mandate of the IDEA requires that school districts ensure that a child's placement "[i]s as close as possible to the child's home." 34 C.F.R. § 300.552(a)(3).
Plaintiff argues that placing A.S. at Hall High was not appropriate because in the freedom available to him in a public high school, he would self-medicate, not do his homework, and not progress academically. (Tr. 10/4/99 at 47, 79.) Plaintiff relies on the testimony of Dr. Cherkes-Julkowski and Dr. Allen Jacobs. The testimony of these witnesses will be considered in turn.
Dr. Cherkes-Julkowski evaluated A.S. in November 1997. (Tr. 10/15/99 at 76, 79.) At the request of the plaintiff, she evaluated him again in May 1999. (Parent Ex. 1.) *429 She also prepared a report assessing the programs at Hall High and Oxford Academy to determine if they were appropriate to meet A.S.'s needs. (Parent Ex. 1a; Tr. 10/15/99 at 22.)
Dr. Cherkes-Julkowski testified that [t]he essence of what [A.S.] needs is interactive instruction. That is, somebody has to be dialoguing with him pretty regularlyin fact, regularly. If he isn't in dialogue, then he's not actively explicitly coding information, which means it doesn't get stored in any explicit way in long-term memory, and that means, it's not retrievable....
[S]o the interaction is important, and as far as I know, it's very difficult to create that kind of interaction on an ongoing basis except for [a] one-to-one setting.
[A.S.] also needs a great deal of attention control.... That includes refocusing him, pacing him in a way that he can manage, short periods of instruction with some down time, adequate exposure because he needs it.... [H]e can't deal with large amounts of information at a given time. He needs to have things broken down into smaller units.... [T]he kind of education that would address his learning difficulties would be a place where he could be without distraction and constant interaction.
(Tr. 10/15/99 at 27-29.)[10]
Under cross-examination, Dr. Cherkes-Julkowski testified that when she evaluated A.S. on May 5, 1999, she had not seen him since November 1997. (Tr. 10/15/99 at 79.) In conducting the May 5, 1999 evaluation and in preparing her subsequent report regarding the two programs, Dr. Cherkes-Julkowski did not observe A.S. in any type of educational setting, did not review the notes of PPT meetings, did not speak to any of his teachers, did not review Devereux's treatment plan, and did not review the Board's plan to transition A.S. to Hall High School. (Tr. 10/15/99 at 92-100.)[11] Dr. Cherkes-Julkowski's visit *430 to Hall High consisted of observing two classroom periods, a social studies class and a resource room, which was not part of A.S.'s proposed curriculum. (Tr. 10/15/99 at 107-08.) Finally, although she testified that A.S. needed some academic support beyond what would be available to him in an ordinary school day, she did not know whether he needed a 24 hour placement for academic issues. (Tr. 10/15/99 at 108.)
Plaintiffs other expert, Dr. Jacobs, is a psychiatrist who conducted an evaluation of A.S. on October 12, 1999. (Parent Ex. 15.) Based on that examination, Dr. Jacobs concluded that A.S. would need residential placement. (Tr. 10/25/99 at 27.) Regarding the Board's proposed placement at Hall High, Dr. Jacobs stated
I do not feel that Hall High ... could fulfill [A.S.'s] educational needs and, given what they would propose to do for him educationally, he would rapidly fail academically and then his behavioral and other difficulties would be likely to resurface with him again needing [a] highly structured behaviorally oriented educational program.
(Parent Ex. 15 at 5.) Dr. Jacobs determined that Oxford Academy was an appropriate program for A.S. because it
offers an ideal setting for [A.S.] to make relevant progress because of its truly individualized approach in all aspects of his education. Also, it offers the structured setting with behavioral consequences/rewards that is necessary to foster his interest and progress academically.... [T]he residential component is an important component of his education. Without it he would not maintain any progress.
(Parent Ex. 15 at 4.)
Dr. Jacobs' area of expertise lies in substance abuse and eating disorders. (Tr. 10/25/99 at 61.) He is not familiar with the IDEA and did not use the legal framework of the IDEA in making his recommendation. (Tr. 10/25/99 at 92-94.) He had not previously participated in a due process hearing. Before his evaluation, he had not met A.S. and his interaction with him was limited to a single ninety minute evaluation session. Dr. Jacobs, in preparing his evaluation, did not speak to anyone from West Hartford about the proposed program for A.S.'s placement or to any of the faculty at Devereux. (Tr. 10/25/99 at 52.) He did not review the minutes of the PPT meetings leading to the transition plan for A.S. (Tr. 10/25/99 at 82.) Dr. Jacobs has never observed any student in the West Hartford special education program or any special education learning disabilities class in any public high school. (Tr. 10/25/99 at 103.) Dr. Jacobs did not visit Oxford Academy as part of his evaluation and before his involvement in this action had never heard of it. (Tr. 10/25/99 at 74.)
In contrast to the testimony of Dr. Cherkes-Julkowski and Dr. Jacobs, school professionals experienced in special education and educators closely involved with A.S.'s program at Devereux testified both that A.S. was ready to transition from a residential facility and that the proposed program at Hall High with support was an appropriate placement. Dr. Nancy DePalma, a professional school counselor for Hall High, was designated by the hearing officer as an expert in the area of counseling for middle and high school students. *431 (Tr. 8/26/99 at 16.) She met A.S. in the fall of the 1998-99 school year and attended the February PPT. (Tr. 8/26/99 at 17.) In January 1999, she met with Jack Edmunds and Sallie Stevens to develop a transition plan and program of studies that would meet A.S.'s IEP, his transition needs, and credit requirements. (Tr. 8/26/99 at 18.) She testified that the program offered to A.S. at Hall High was appropriate to meet his needs. (Tr. 8/26/99 at 60-61.)
Dr. Frank Morisano, a school psychiatrist for West Hartford Public Schools, met A.S. when A.S. was in the sixth grade. (Tr. 8/24/99 at 94.) Dr. Morisano evaluated A.S. in the fall of 1997, conducted a follow-up evaluation in January 1998, and administered a test to A.S. in March 1999 to assess his academic skills. (Tr. 8/24/99 at 94-95; Board Ex. 33.) In addition to testing A.S., Dr. Morisano observed A.S. in classes at Devereux and had discussions with A.S.'s teachers, and participated in A.S.'s PPT meetings concerning A.S.'s program during the 1998-99 school year. (Tr. 8/24/99 at 106, 110.). Dr. Morisano testified that A.S. did not require a residential placement or one-on-one instruction. (Tr. 8/24/99 at 115.) He recommended that A.S. be instructed in a small group and receive one-on-one tutoring as a supplement. (Tr. 8/24/99 at 123.) He testified that being taught in a small group would assist in building A.S.'s self esteem, an area in which he needed development. (Tr. 8/24/99 at 123-24.) Dr. Morisano felt that Hall High's program would address A.S.'s weaknesses and was an appropriate placement for A.S. (Tr. 8/24/99 at 142, 155.)
Glenn McGrath is A.S.'s case manager. The hearing officer classified him as an expert in the field of education of students with ED. (Tr. 6/16/99 at 120.) McGrath became involved with A.S. when A.S. was in the sixth grade at King Phillip Middle School. (Tr. 6/16/99 at 95.) He continued his relationship with A.S. while A.S. attended Devereux from grades 7 through 9. McGrath testified that at the May 1998 PPT, he recommended that the PPT consider day treatment programs for A.S. (Tr. 6/16/99 at 122.) However, when Devereux indicated that A.S. was making significant progress with some of the behaviors that had impeded his learning, McGrath no longer considered day treatment programs. (Tr. 6/16/99 at 131-132.) McGrath testified that by September 1998, A.S.'s improvements marked a "big big change" and that he had "cut[] a corner... in terms of major issues that interfered with his learning." (Tr. 8/9/99 at 39-40.) He felt that in light of A.S.'s needs, another residential placement would not be consistent with the principle that students should be educated in the least restrictive environment and that Hall High could provide supportive services to meet A.S.'s needs. (Tr. 8/24/99 at 23-24.) McGrath believed that A.S. would benefit both academically and socially from his educational program at Hall High. (Tr. 8/24/99 at 44.)
Sallie Stevens, A.S.'s teacher at Devereux and lead case manager, was involved with A.S. following his admission to Devereux in June 1998. (Tr. 6/17/99 at 11.) She testified that A.S. no longer required a 24 hour residential educational placement in order to benefit from his education and that it is not unusual to transition Devereux students back into a public school environment. (Tr. 6/17/99 at 17, 19, 44, 60.) Stevens visited Hall High with A.S. and met with certain staff who would be working with him. (Tr. 6/17/99 at 34.) Stevens concluded that the Board's recommended program at Hall High could provide A.S. with small academic classes structured to allow monitoring of his behavior and support for meeting his academic needs. (Tr. 6/17/99 at 34.) She testified that she was comfortable with A.S.'s academic progress *432 and believed he would continue to make progress at Hall High. (Tr. 6/17/99 at 55, 80-81.)
Themis Enright was A.S.'s therapist for two years and conducted weekly individual therapy sessions with him. (Tr. 8/10/99 at 13.) She participated in his PPTs. (Tr. 8/10/99 at 19.) She testified that having an opportunity to interact with peers both inside and outside a classroom setting was an important aspect of A.S.'s therapy. (Tr. 8/10/99 at 49-50.)
In light of all this evidence, I conclude that the Board's recommended placement of A.S. at Hall High would have provided him with meaningful educational benefit. A.S.'s classes at Hall High would have been small enough to permit individualized instruction.[12] He would have been taught by teachers certified in special education, who would have had the benefit of a teaching assistant as a resource. (Tr. 8/24/99 at 24-26.) In addition, he would have been supported by home tutoring and weekly individual counseling. His program and needs were to be reassessed by the PPT shortly after he began at Hall High. (Tr. 8/24/99 at 32; Tr. 9/14/99 at 51.) There is no evidence that the concerns and recommendations of Dr. Cherkes-Julkowski could not have been addressed in the Hall High placement, which was consistent with the IDEA requirement that children with disabilities be educated in the least restrictive environment.
Because the challenged IEP was adequate and the Board offered A.S. a FAPE consistent with the IDEA, it is unnecessary to consider whether the private educational services obtained by the parents were appropriate to the child's needs. M.C. ex rel. Mrs. C. v. Voluntown Bd. of Ed., 226 F.3d 60, 65 (2d Cir.2000)("Only if a court determines that a challenged IEP was inadequate should it proceed to the second question.")

V. CONCLUSION

Accordingly, the Board's motion for summary judgment is hereby granted and the plaintiffs motion for summary judgment is hereby denied.[13]
NOTES
[1] Plaintiff's request for leave to proceed under a fictitious name has been granted (doc. # 6).
[2] Doc. # 43 Def.'s Mtn for SJ; Doc. # 47 PL's Mtn for SJ.
[3] A.S.'s parents are divorced. P.B.S., the named plaintiff, is A.S.'s mother. She did not attend any of the PPT meetings concerning A.S.'s educational programming for the school years at issue. A.S.'s father attended all the PPTs. He also is acting as the plaintiff's attorney.
[4] The token economy measures student compliance. As the student earns an increasing percentage of possible tokens, the student can advance through an established hierarchy, which corresponds to increased privileges and independence. There are three phases within the system with phase three being the phase where a child requires the most structure and phase one being the phase where a child requires the least structure. Within each phase there are grade levels. (Tr. 8/10/99 at 58.)
[5] The "stay put" provision of the IDEA, 20 U.S.C. § 1415(j), provides in relevant part: [D]uring the pendency of any proceedings conducted pursuant to this section, unless the State or local educational agency and the parents otherwise agree, the child shall remain in the then-current educational placement of such child ....
[6] A.S. subsequently left Oxford Academy and is now living with his mother in Martha's Vineyard, Massachusetts. He is attending a public high school there for the 2000-2001 academic year.
[7] The matter came for a hearing before the hearing officer on June 16 and 17, 1999; August 9, 10, 24, and 26, 1999; September 14, 1999; October 4, 12, 15, and 25, 1999; and November 22, 1999.
[8] The hearing officer heard testimony from Glenn McGrath, Director of Pupil Services for the West Hartford School district; Sallie Stevens, a special education teacher from Devereux and the lead case manager for A.S.; Themis Enright, A.S.'s therapist and case manager at Devereux; Dr. Frank Morisano, a school psychiatrist for West Hartford Public Schools; Dr. Nancy DePalma, a guidance counselor at Hall High; A.S.'s father; Philip Davis, Headmaster at Oxford Academy; Robert Hanson, A.S.'s history teacher at Oxford Academy; Martha White, Dean of Students at Oxford Academy; Dr. Miriam Cherkes-Julkowski, an educational evaluator; and Dr. Allen Jacobs, a psychiatrist.
[9] See AR Ex. 52.
[10] Dr. Cherkes-Julkowski's report concerning the programs at Hall High and Oxford Academy (Parent Ex. 1a.), concludes that "A.S.'s profile suggests that he would not be able to sustain attention on his own" in the classes at Hall High. (Parent Ex. 1a at 2.) The report also concludes that Oxford Academy "is designed to meet [A.S.'s] needs due to its one-to-one, highly individualized nature as well as the opportunity for interactive instruction." (Parent Ex. 1a at 3.)
[11] Regarding the materials Dr. Cherkes-Julkowski reviewed in making her recommendation, the following testimony is relevant:

Q. And you hadn't reviewed the recommendations by West Hartford for the program that they felt was appropriate for him
A. Well, I don't know that that's true. When I went to see West Hartford, it was my assumption that they were showing me the program that [A.S.] would be in.
Q. But you observed only one class. Isn't that correct?
A. [T]here was a misunderstanding apparently.... But I do assume that what I was shown was shown to me because that was what was intended to be available to be provided for [A.S.]
Q. Did you ask for a copy of the transition plan to review before you came to Hall High School?
A. No ....
Q. Did you ask for and diddid [plaintiff's counsel] did you request of [plaintiff's counsel] the copies of the PPT meetings and the discussion about the transition plan prior to going to Hall High School?
A. No, I did not.
Q. Would that have been helpful to you in making a determination about whether that program was appropriate?
A. I thought that what would be helpful was seeing the program.
* * * * * *
Q. How would you be able to assess what it was that West Hartford was proposing if you hadn't even read or been provided copies of the 
A. Well, I thought I was doing better than seeing what West Hartford was proposing. I thought I was seeing what West Hartford was doing.
(Tr. 10/15/99 at 95-97.)
[12] Although the cap on class size was 15 (Tr. 8/26/99 at 25), in November 1999 the enrollment was 3 students in resource mathematics, 4 in resource science, 3 in resource history, 12 in resource English, and 5 in learning strategies. (Board Ex. 44.) There were four to eight student in A.S.'s classes at Devereux.
[13] In light of these rulings, the Board's motion to strike plaintiff's reply and appendix are denied as moot.