M.C., by & through his parent & next friend MRS. C, Plaintiff–Appellee,

v.

**VOLUNTOWN BOARD OF EDUCATION, Defendant–Appellant.**

No. 99–9282.

United States Court of Appeals, Second Circuit.

Argued: Aug. 7, 2000

Decide: Sept. 1, 2000.

Hugh W. Cuthbertson, Siegel, O'Connor, Schiff & Zangari, New Haven, CT, for Defendant–Appellant.

Andrew A. Feinstein (David C. Shaw, on the brief), Law Offices of David C. Shaw, Hartford, CT, for Plaintiff–Appellee.

Before: CALABRESI, CABRANES, and POOLER, Circuit Judges.

JOSÉ A. CABRANES, Circuit Judge:

The question presented is whether plaintiff M.C., a disabled child within the meaning of the Individuals with Disabilities Education Act ("IDEA" or "the Act"), 20 U.S.C. § 1401(3)(A), is entitled to reimbursement under the IDEA from defendant Voluntown Board of Education ("Voluntown" or "the Board") for the costs of private school tuition and private psychological counseling. Voluntown appeals from a judgment of the United States District Court for the District of Connecticut (Gerald L. Goettel, *Judge of the United States District Court for the Southern District of New York, sitting by designation*), entered July 9, 1999, ordering Voluntown to reimburse M.C. for these costs. For the reasons stated below, we vacate the District Court's judgment with respect to the costs of private school tuition and remand for further proceedings consistent with this opinion, and we reverse the judgment with respect to the costs of psychological counseling.

## I.

This case involves the nature and extent of a state's obligations under the IDEA to reimburse a disabled child for the costs of private school tuition and private psychological counseling. Before turning to the facts of this particular case, we review the basic requirements of the Act.

### A. The Statutory Scheme

■ The IDEA "is the most recent Congressional enactment in 'an ambitious fed-eral effort to promote the education of handicapped children.'" *Walczak v. Florida Union Free Sch. Dist.*, 142 F.3d 119, 122 (2d Cir.1998) (quoting *Board of Educ. v. Rowley*, 458 U.S. 176, 179, 102 S.Ct. 3034, 73 L.Ed.2d 690 (1982)). Under the Act, states that receive funding from Congress are required to provide "all children with disabilities" with a "free appropriate public education." 20 U.S.C. § 1412(a)(1)(A); *see also Rowley*, 458 U.S. at 181, 102 S.Ct. 3034.[1] This "free appropriate public education" must include "special education and related services" tailored to meet the unique needs of the particular child, 20 U.S.C. § 1401(8), and must be "reasonably calculated to enable the child to receive educational benefits," *Rowley*, 458 U.S. at 207, 102 S.Ct. 3034. The IDEA, however, does not require states to maximize the potential of handicapped children. *See id.* at 197 n. 21, 102 S.Ct. 3034. As the Supreme Court explained in *Rowley*, the purpose of the Act was "more to open the door of public education to handicapped children on appropriate terms than to guarantee any particular level of education once inside." *Id.* at 192, 102 S.Ct. 3034.

The particular educational needs of a disabled child and the services required to meet those needs must be set forth at least annually in a written individualized education plan ("IEP"). *See* 20 U.S.C. § 1414(d)(4)(A)(i). The IEP is formulated by an "IEP Team" composed of, among others, the child's parents, a school official qualified in special education, the child's teacher, and, where appropriate, the child. *See id.* § 1414(d)(1)(B). Although the child's parents participate in formulation of the IEP, parents who are dissatisfied with a proposed IEP may file a complaint with the state or local educational agency. *See*

1. In 1997, the IDEA was amended and its sections renumbered. *See* Individuals with Disabilities Education Act Amendments of 1997, Pub.L. No. 105–117, 111 Stat. 37. Although most of the events in this case took place prior to June 4, 1997, the effective date of the amendments, we refer throughout this opinion to the current version of the Act for the sake of convenience. We discuss one potentially relevant aspect of the amendments below.

*id.* § 1415(b)(6). Any such complaint is resolved through an "impartial due process hearing," *id.* § 1415(f), at which school authorities have the burden of supporting the proposed IEP, *see Walczak*, 142 F.3d at 122. Following exhaustion of remedies available under state law, any party still aggrieved may sue in either state or federal court. *See id.* § 1415(i)(2)(A).

## B. The Present Case

The facts relevant to the present appeal are essentially undisputed. M.C. is currently seventeen years old and has been receiving special education services from Voluntown since he was in fourth grade. M.C. has been diagnosed with Attention Deficit Hyperactivity Disorder with a secondary diagnosis of Central Auditory Processing Disorder. He is also reported to have a learning disability in written expression and difficulty processing information, particularly verbal information.

On September 14, 1995, M.C.'s IEP Team met to discuss M.C.'s IEP for the 1995–96 school year, when M.C. would be in seventh grade. Minutes from the meeting reveal that the IEP Team recommended various accommodations for M.C. in the regular classroom and "counseling on an as needed basis." In the fall of 1995, however, M.C. began having difficulty in school and experiencing severe depression. To address these problems, the IEP Team convened an emergency meeting on February 8, 1996, and agreed that M.C. required a new placement outside the Voluntown school system. Until an appropriate placement could be found, the IEP Team decided to place M.C. on homebound instruction with ten hours of tutoring per week.[2]

For the remainder of the 1995–96 school year, M.C. was instructed at home, during which time his depression improved but his academic performance declined even further. On June 17, 1996, when M.C.'s IEP Team convened to develop M.C.'s IEP for the next school year, he had not yet satisfied the requirements for advancing to the eighth grade. To ensure that M.C. advanced, the IEP Team decided to give M.C. "incomplete[s]" in certain subjects with the expectation that he would make up the work in these areas through summer tutoring. Although one member of the IEP Team, a non-lawyer "advocate" hired by M.C.'s parents, suggested instead that M.C. attend a five-week summer program at the Rectory School—a private school in Pomfret, Connecticut—the IEP Team approved summer tutoring at home for thirty hours or as long as necessary for M.C. to pass the seventh grade. With respect to M.C.'s placement for the 1996–97 school year, the IEP Team agreed again that M.C. needed a placement outside of the Voluntown school system, but the Team was unable to agree on a specific school. M.C.'s IEP for that year did, however, provide for 45 minutes of individual counseling per week with a school psychologist and one hour per week of "social skills group."

Notwithstanding the IEP Team's recommendation for home tutoring during the summer of 1996, and its rejection of the advocate's alternative suggestion of the Rectory School, M.C.'s parents unilaterally enrolled M.C. in the Rectory School's five-week summer program. M.C. successfully completed the program and was able to advance to the eighth grade.[3] Based in

2. Although the February 8, 1996 IEP refers to weekly "[c]onsultation" with M.C.'s "case manager" and teachers, it does not appear from the record that the IEP Team recommended, or arranged for, any psychological counseling for M.C. while he was on homebound instruction. During oral argument, however, counsel for Voluntown suggested that such counseling would have been available during this period from a school psychol-

ogist, notwithstanding M.C.'s absence from school. For reasons discussed below, the availability *vel non* of school psychological counseling during M.C.'s period of homebound instruction is immaterial for purposes of this appeal.

3. After a state mediation in the fall of 1996, Voluntown agreed to reimburse M.C. for the costs of the Rectory School summer program.

part on M.C.'s success in the Rectory School summer program, Voluntown agreed that the Rectory School would be an appropriate placement for the 1996–97 school year, but specified that his placement there was contingent on the Rectory School's signing a contract with Voluntown to follow M.C.'s IEP and otherwise be accountable for M.C.'s progress. During the summer of 1996, Voluntown and the Rectory School conducted negotiations over whether the school would sign a contract. In September 1996, however, these negotiations broke down without an agreement.

On August 26, 1996, while the contract negotiations between Voluntown and the Rectory School were taking place, M.C.'s parents requested an impartial due process hearing from the state educational agency to review the educational placement proposed in M.C.'s IEP for the 1996–97 school year. *See* 20 U.S.C. § 1415(b)(6). Around the same time, despite the lack of a contract between the Rectory School and Voluntown, M.C.'s parents on their own enrolled M.C. as a residential student for the 1996–97 school year at the Rectory School. M.C. attended the Rectory School for the 1996–97 school year and, by all accounts, made remarkable progress.

On May 27, 1997, while the due process proceedings were pending, M.C.'s IEP Team met to prepare his IEP for the 1997–98 school year, when M.C. would be in ninth grade. During the meeting, M.C.'s parents requested that M.C. be placed again at the Rectory School, citing his progress there during eighth grade. In addition, for the first time, M.C.'s par-

ents requested reimbursement for the services of Dr. Sheldon Gardner, a private psychologist who had treated M.C. for depression from sometime between April and June 1995 until sometime between June and September 1996.[4] The IEP Team rejected both requests. First, with respect to the issue of placement, the IEP Team concluded that the Rectory School would be inappropriate for the 1997–98 school year because the school had refused to enter a contract with Voluntown. Instead of the Rectory School, the IEP Team recommended that M.C. attend either the Learning Center or a program that was open to students beginning in ninth grade at the Norwich Free Academy ("NFA") (the designated high school for Voluntown and seven other area towns) called the Alternative Curriculum for Educational Success ("ACES"). Second, the IEP Team declined to grant reimbursement to M.C.'s parents for Dr. Gardner's fees on the ground that the IEP Team had not recommended or authorized "private counseling" as part of M.C.'s IEP for the period he had been treated by Dr. Gardner. Notwithstanding the IEP Team's placement recommendations, M.C. remained at the Rectory School for ninth grade.[5]

On September 15, 1997, having held six days of hearings and having heard testimony from eleven witnesses, the impartial due process hearing officer (the "Hearing Officer") filed a Final Decision and Order finding partially in M.C.'s favor and partially in Voluntown's favor. With respect to the 1996–97 school year, the Hearing Officer ruled that the Rectory School was an appropriate placement, and ordered Voluntown to reimburse M.C.'s parents for

Accordingly, those costs are not at issue on this appeal.

4. There is some dispute over when M.C.'s treatment from Dr. Gardner began and ended. M.C.'s mother testified during the due process hearing that M.C. had seen Dr. Gardner from April or May 1995 until about September 8, 1996. Dr. Gardner, on the other hand, testified that he had treated M.C. from June 1995 until M.C. started summer school

at the Rectory School, on June 24, 1996. For reasons discussed below, this dispute is immaterial for purposes of this appeal.

5. The Rectory School operates only through ninth grade. In the fall of 1998, M.C. enrolled in the regular tenth-grade education program at NFA. M.C.'s placements for that year and subsequent years are not at issue on this appeal.

the costs of tuition and tutoring.[6] With respect to the 1997–98 school year, however, the Hearing Officer concluded, in light of the school's refusal to sign a contract with Voluntown, that the Rectory School was *not* an appropriate placement. The Hearing Officer could not assess whether the Learning Clinic, one of the two placements proposed for M.C.'s ninth-grade year by the IEP Team, was appropriate because M.C.'s parents "would not allow a significant step in determining that—a review of [M.C.'s] records as part of the intake process at [the school]." Nevertheless, the Hearing Officer found that the other program proposed by the IEP Team for that year—the ACES program at NFA—was appropriate for M.C., and rejected M.C.'s request for reimbursement for the costs of the Rectory School for 1997–98 on that basis. Finally, to the extent relevant here, the Hearing Officer rejected the reimbursement request for M.C.'s treatment from Dr. Gardner, apparently on the ground that Dr. Gardner's services "were not called for in [the] IEP [for 1995–96] where only school counseling was indicated."

Dissatisfied with several of the Hearing Officer's conclusions, in October 1997, M.C. (by and through his mother) filed a complaint in the District Court under 20 U.S.C. § 1415(i)(2).[7] Following amendment of the complaint, both parties moved for summary judgment. By opinion filed July 28, 1999, the District Court granted partial summary judgment to each party on different issues. *See M.C. v. Voluntown Bd. of Educ.*, 56 F.Supp.2d 243 (D.Conn.1999). To the extent relevant here, the District Court overruled two of the Hearing Officer's conclusions that had been adverse to M.C. Specifically, the District Court held that M.C. was, in fact,

entitled to reimbursement from Voluntown for the costs of *both* the Rectory School for the 1997–98 school year, *see id.* at 250–57, and Dr. Gardner's psychological counseling from 1995 to 1996, *see id.* at 257–59. In addition, the District Court ruled that M.C. was entitled to part of his attorney's fees and costs. *See id.* at 260–62.

On September 9, 1999, the District Court entered judgment against Voluntown in the amount of $19,025.00 plus attorney's fees and costs in the amount of $35,081.65. Thereafter, Voluntown filed this timely appeal.

## II.

Generally, two questions are relevant to a federal court's review of a challenged IEP under the IDEA: (1) whether the state complied with the procedural requirements of the Act; and (2) whether the challenged IEP was "reasonably calculated to enable the child to receive educational benefits." *Rowley*, 458 U.S. at 206–07, 102 S.Ct. 3034; *accord Walczak*, 142 F.3d at 129. In the present case, M.C. does not allege that the Board violated any of the Act's procedural requirements, so only the second, substantive question is at issue. Moreover, the proceedings before the Hearing Officer and the District Court narrowed the disputes between the parties so that there are only two matters remaining for our consideration: (1) whether M.C. is entitled to reimbursement for the costs of the Rectory School for the second year spent at that school (1997–98), when M.C. was in the ninth grade; and (2) whether M.C. is entitled to reimbursement for the costs of Dr. Gardner's psychological treatment from 1995 to 1996, when M.C. was principally in the seventh grade.[8]

---

6. The Hearing Officer ruled that M.C. was *not* entitled to reimbursement for the costs of the residence program at the Rectory School. That ruling, which was affirmed by the District Court, is not at issue on this appeal.

7. Voluntown did not seek judicial review of the Hearing Officer's ruling requiring reim-

bursement for the costs of the Rectory School for the 1996–97 school year.

8. Voluntown does not challenge on appeal the District Court's decision to grant M.C. attorney's fees.

■ We review the District Court's decisions on these issues *de novo*. *See, e.g., J.D. v. Pawlet School Dist.*, 224 F.3d 60 (2d Cir.2000). In doing so, however, we are mindful that the role of the federal courts in reviewing state educational decisions under the IDEA "is circumscribed." *Muller v. Committee on Special Educ.*, 145 F.3d 95, 101 (2d Cir.1998). Such decisions are subject to "independent" judicial review, *Rowley*, 458 U.S. at 205, 102 S.Ct. 3034, but this "is by no means an invitation to the courts to substitute their own notions of sound educational policy for those of the school authorities which they review," *id.* at 206, 102 S.Ct. 3034. To the contrary, a federal court is required to give "due weight" to the rulings of a local or state administrative hearing officer, *id.*, mindful that the judiciary generally "lack[s] the specialized knowledge and experience necessary to resolve persistent and difficult questions of educational policy," *id.* at 208, 102 S.Ct. 3034 (internal quotation marks omitted); *accord Muller*, 145 F.3d at 101–02; *Walczak*, 142 F.3d at 129. Judicial deference "is particularly appropriate when . . . the state hearing officers' review has been thorough and careful." *Walczak*, 142 F.3d at 129.

## A. Reimbursement for the Costs of Private School Tuition

As noted, the District Court ruled, contrary to the Hearing Officer, that M.C. is entitled to reimbursement for the costs of the Rectory School for the 1997–98 school year, when he was in the ninth grade. *See M.C.*, 56 F.Supp.2d at 250–57. In making this ruling, the District Court declined to consider whether either of the placements proposed by M.C.'s IEP for that year—the Learning Center or the ACES program—was adequate under the IDEA. *See id.* at 250–51; *see also id.* at 256. Instead, noting that M.C.'s IEP had failed to recommend or authorize his placement when his parents first placed him at the Rectory School (in the eighth grade), the District Court looked only at whether Voluntown

had a valid reason for rejecting the Rectory School as a placement for the ninth grade. *See id.* at 251–56. Relying on *Florence County Sch. Dist. Four v. Carter*, 510 U.S. 7, 114 S.Ct. 361, 126 L.Ed.2d 284 (1993), the District Court concluded that Voluntown's sole reason for rejecting the private placement—the absence of a contract between Voluntown and the Rectory School—was insufficient to bar reimbursement under the IDEA. *See M.C.*, 56 F.Supp.2d at 256–57.

■ We agree with Voluntown that the District Court's analysis was flawed. Under the Supreme Court's decision in *School Committee of Town of Burlington v. Department of Educ. of Massachusetts*, 471 U.S. 359, 370, 105 S.Ct. 1996, 85 L.Ed.2d 385 (1985), whether the parents of a disabled child are entitled to reimbursement for the costs of a private school turns on two distinct questions: first, whether the challenged IEP was adequate to provide the child with a free appropriate public education; and second, whether the private educational services obtained by the parents were appropriate to the child's needs. *See, e.g., Muller*, 145 F.3d at 104–05; *Walczak*, 142 F.3d at 129; *Still v. DeBuono*, 101 F.3d 888, 891 (2d Cir.1996). If the challenged IEP was adequate, the state has satisfied its obligations under the IDEA and the necessary inquiry is at an end. *See, e.g., Walczak*, 142 F.3d at 134 (holding that because the challenged IEP was adequate, the defendant school board could not "be ordered to reimburse the parents for expenses incurred as a result of their decision to remove their child from the . . . program"). Only if a court determines that a challenged IEP was inadequate should it proceed to the second question. *See, e.g., T.R. v. Kingwood Township Bd. of Educ.*, 205 F.3d 572, 582 (3d Cir.2000). Then, reimbursement is appropriate only if the parents' private placement was itself adequate under the Act.

■ In the present case, the District Court erred by skipping directly to the

second step of the *Burlington* test—that is, by failing to consider first whether either of the placements proposed in M.C.'s IEP for the ninth grade, the Learning Center or the ACES program, was adequate. The fact that the Board did not "offer M.C. an appropriate placement for the *eighth* grade," *M.C.*, 56 F.Supp.2d at 256 (emphasis added), when M.C. started at the Rectory School, makes no difference to the required analysis. Since the IDEA requires a child's IEP Team to formulate a new IEP at least every year, *see* 20 U.S.C. § 1414(d)(4)(A)(i), the adequacy *vel non* of an IEP—here, M.C.'s IEP *for the ninth grade*—is to be judged on its own terms. Nor does the Supreme Court's decision in *Carter*, on which the District Court relied, justify a departure from the *Burlington* test. As we have explained, the Supreme Court in *Carter* held merely "that *once the Burlington two-factor test is satisfied,* parents can obtain reimbursement for privately obtained educational services, even if those services do not fully satisfy the state educational agency's standards." *Still*, 101 F.3d at 892 (emphasis added); *see also Walczak*, 142 F.3d at 129 (noting that the holding in *Carter* applies only "where both prongs of [the] *Burlington* test are [otherwise] satisfied"). Thus, even under *Carter*, a court seeking to determine whether parents are entitled to reimbursement must *first* ask whether the challenged IEP was adequate; the holding in *Carter* comes into play only if the answer to this threshold question is no. *See T.R.*, 205 F.3d at 582 ("[*Carter*] gives parents the right to reimbursement for a unilateral placement in a non-qualifying school only 'if a federal court concludes both that *the public placement violated IDEA* and that the private school placement was proper under the Act.' By its terms, this is a two-pronged inquiry. . . . The parental reimbursement mandate comes into play only if [the public placement violated IDEA]." (quoting *Carter*, 510 U.S. at 15, 114 S.Ct. 361) (emphasis in *T.R.*)).

▮ Although Voluntown urges us to reverse and enter judgment in its favor,

we conclude that vacatur of this part of the District Court's judgment and remand for the District Court to consider whether either of the IEP's proposed placements was adequate is more appropriate. M.C.'s parents refused to disclose M.C.'s records to the Learning Center, so there is little evidence in the present record with respect to whether the Learning Center would have been an appropriate placement. As for the ACES program at the NFA, there is some dispute over the extent to which the program integrates disabled children with nondisabled children—a factor that is relevant to the inquiry in light of the IDEA's "strong preference for children with disabilities to be educated, 'to the maximum extent appropriate,' together with their non-disabled peers." *Walczak*, 142 F.3d at 122 (quoting 20 U.S.C. § 1412(5)(A)). In addition, although the Student Services Administrator of the NFA testified at the due process hearing that the ACES program served some children, like M.C., with learning disabilities, she testified also that the program primarily served children with emotional disabilities or some level of emotional disturbance. Under these circumstances, we believe that the task of determining whether the challenged IEP satisfied the IDEA is better assigned to the District Court in the first instance.

On remand, the District Court should therefore undertake to determine whether either the Learning Center or the ACES program would have been an adequate placement for M.C. in the ninth grade. In making this determination, the District Court should, of course, give "due weight" to the finding of the Hearing Officer that the ACES program was adequate. *Walczak*, 142 F.3d at 129. In addition, the District Court should consider the relevance, if any, of M.C.'s parents' refusal to release M.C.'s records to the Learning Center. In this connection, we note that the 1997 amendments to the IDEA—which may or may not apply to M.C.'s claim for tuition reimbursement since some (though not all) events relevant to the claim took place prior to June 4, 1997, when the

amendments became effective—provide that reimbursement for private schooling "may be reduced or denied ... upon a judicial finding of unreasonableness with respect to actions taken by the parents." 20 U.S.C. § 1412(10)(C)(iii)(III); *cf. Warren G. v. Cumberland County Sch. Dist.*, 190 F.3d 80, 86 n. 3 (3d Cir.1999) (declining to apply § 1412(10)(C)(iii)(III) "because *all* of the events in this case occurred prior to the effective date of the amendment" (emphasis added)).

## B. Reimbursement for the Costs of Psychological Counseling

■ The District Court also ruled, contrary to the Hearing Officer, that M.C. is entitled to reimbursement for the costs of his psychological treatment by Dr. Gardner from 1995 to 1996, when M.C. was principally in the seventh grade. *See M.C.*, 56 F.Supp.2d at 257–59. Under the IDEA, a disabled child is entitled to psychological counseling at no cost if such services are "required to assist [the child] to benefit from special education." 20 U.S.C. § 1401(22); *see also T.G. v. Board of Educ. of Piscataway*, 576 F.Supp. 420, 422–24 (D.N.J.1983), *aff'd*, 738 F.2d 425 (3d Cir.1984) (table). Reviewing the record, the District Court concluded that "there is a substantial connection between M.C.'s depression [for which he was treated by Dr. Gardner] and his progress, or lack thereof, in school." *M.C.*, 56 F.Supp.2d at 258; *see also id.* at 258–59 ("[T]here is evidence ... that M.C.'s depression was linked to his failures at school."). On this basis, the District Court ordered Voluntown to reimburse M.C. for the costs of his psychological counseling with Dr. Gardner.

■ Even assuming for the argument that (1) psychological counseling was "required to assist [M.C.] to benefit from special education" during the period he was treated by Dr. Gardner, 20 U.S.C. § 1401(22); and (2) M.C.'s IEPs for that period failed adequately to address this need for counseling, we conclude that M.C. is barred as a matter of law from reimbursement for Dr. Gardner's services. It

is well established that "equitable considerations are relevant in fashioning relief" under the IDEA. *Burlington*, 471 U.S. at 374, 105 S.Ct. 1996; *see Carter*, 510 U.S. at 16, 114 S.Ct. 361 ("Courts fashioning discretionary equitable relief under IDEA must consider all relevant factors, including the appropriate and reasonable level of reimbursement that should be required."); *see also Board of Educ. of LaGrange Sch. Dist. No. 105 v. Illinois State Bd. of Educ.*, 184 F.3d 912, 917–18 (7th Cir.1999). Although such considerations will often weigh in favor of parents seeking relief under the Act, *see, e.g., Warren G.*, 190 F.3d at 85–86, courts have held uniformly that reimbursement is barred where parents unilaterally arrange for private educational services without ever notifying the school board of their dissatisfaction with their child's IEP. *See Ash v. Lake Oswego Sch. Dist., No. 7J*, 980 F.2d 585, 589 (9th Cir.1992); *Mary P. v. Illinois State Bd. of Educ.*, 934 F.Supp. 989, 992 (N.D.Ill.1996); *Garland Independent School Dist. v. Wilks*, 657 F.Supp. 1163, 1168 (N.D.Tex. 1987); *see also Bernardsville Bd. of Educ. v. J.H.*, 42 F.3d 149, 158 (3d Cir.1994) ("[A]s a practical reality, and as a matter of procedural law ..., the right of review contains a corresponding parental duty to unequivocally place in issue the appropriateness of an IEP."); *Town of Burlington v. Dep't of Educ.*, 736 F.2d 773, 799 (1st Cir.1984) (noting that a distinction should be made "between a unilateral parental transfer made after consultation with the school system, yet still an action without the system's agreement, and transfers made truly unilaterally, bereft of any attempt to achieve negotiated compromise and agreement"), *aff'd*, 471 U.S. 359, 105 S.Ct. 1996, 85 L.Ed.2d 385 (1985); *cf. Ivan P. v. Westport Bd. of Educ.*, 865 F.Supp. 74, 82 (D.Conn.1994) (holding that the plaintiff parents were entitled to reimbursement for the period prior to seeking due process review because "[t]he record in this case reflects significant efforts at communication between the plaintiffs and the [defendant school board].... Thus, this is not a case where the parents failed

to voice their dissatisfaction with a placement ....."), *aff'd,* 101 F.3d 686 (2d Cir. 1996) (table). As the district court explained in *Wilks,* parents "cannot, in fairness, expect to recover for expenses [they] incurred prior to contacting the school board about [their] dissatisfaction with [their child's] IEP." *Wilks,* 657 F.Supp. at 1167.

In the present case, M.C.'s parents failed to raise any issue with respect to the extent or nature of the psychological counseling services provided for M.C. in his IEPs until May 27, 1997—at least *eight months after* M.C.'s treatment with Dr. Gardner had ended. Because M.C.'s parents failed to place in issue the appropriateness of M.C.'s IEPs, "it is impossible to determine with any certainty whether [their] expenditures were indeed necessary, or whether a prompt complaint ... might have obviated the need for those expenditures," *Wilks,* 657 F.Supp. at 1168. Under these circumstances, we conclude that M.C. is not entitled to reimbursement for the costs of his treatment with Dr. Gardner.[9]

### III.

In sum, for the reasons stated above, we:

(1) VACATE the judgment of the District Court insofar as it ordered Volun-

town to reimburse M.C. for the costs of private school tuition for the 1997–98 school year;

(2) REMAND for further proceedings consistent with this opinion; and

(3) REVERSE the judgment of the District Court insofar as it ordered Voluntown to reimburse M.C. for the costs of private psychological counseling.

We decline to award costs of this appeal to either party. *See* FED. R.APP. P. 39(a)(4).

---

9. We note that the practical, long-term effect of our holding in this case may be limited. In 1997, Congress amended the IDEA to provide in relevant part:

**(iii) Limitation on reimbursement**
The cost of reimbursement [for private educational services] ... may be reduced or denied—
  **(I)** if—
  **(aa)** at the most recent IEP meeting that the parents attended prior to removal of the child from the public school, the parents did not inform the IEP Team that they were rejecting the placement proposed by the public agency to provide a free appropriate public education to their child, including stating their concerns and their intent to enroll their child in a private school at public expense; or
  **(bb)** 10 business days ... prior to the removal of the child from the public

school, the parents did not give written notice to the public agency of the information described in division (aa);
  . . . .
  **(III)** upon a judicial finding of unreasonableness with respect to actions taken by the parents.
20 U.S.C. § 1412(a)(10)(C)(iii). This amendment appears to codify the previously recognized discretion of a court to reduce or bar reimbursement where parents fail to raise the appropriateness of an IEP in a timely manner. The amendment does not apply to M.C.'s psychological services reimbursement claim, however, because all events relevant to that claim occurred prior to June 4, 1997, the effective date of the 1997 amendments. *See, e.g., Warren G.,* 190 F.3d at 86 n. 3. Accordingly, we need not, and do not, consider the effect, if any, of § 1412(a)(10)(C)(iii) on this case.