P.O., by and through his parents and next friends, L.T. and T.O. Plaintiffs

v.

**GREENWICH BOARD OF EDUCATION Defendant**

Nos. 3:00cv664(DJS), 3:00cv685(DJS).

United States District Court, D. Connecticut.

March 21, 2002.

Valerie E. Maze, Town of Greenwich, Town Hall, Law Dept., Greenwich, CT, for Greenwich Bd. of Educ.

## ORDER

SQUATRITO, District Judge.

Upon review and pursuant to 28 U.S.C. § 636(b)(1)(B) and Rule 2 of the Local Rules for United States Magistrate Judges (D.Conn.), Magistrate Judge Thomas P. Smith's Recommended Ruling (Doc. # 50), is **APPROVED** and **ADOPTED** as the Ruling of this Court, over objection.

**IT IS SO ORDERED.**

## RECOMMENDED RULING ON CROSS MOTIONS FOR SUMMARY JUDGMENT

SMITH, United States Magistrate Judge.

### I. PRELIMINARY STATEMENT

This is an action for attorney's fees and costs incurred in connection with administrative proceedings initiated by the plaintiff under the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. §§ 1400 *et seq.* The plaintiff's parents allege that they were "prevailing parties" in the state administrative proceeding within the meaning of 20 U.S.C. § 1415(i)(3), and that they are entitled to an award of attorney's fees incurred in pursuing both the administrative action and this action in U.S. District Court.[1] Now pending before the court are the parties' cross-motions for summary judgment, as well as the plain-

Andrew Alan Feinstein, Law Offices of David C. Shaw, Hartford, CT, for P.O., by his parents & next of friends L.T. & T.O.

---

**1.** The Board also brought its own action, No. 3:00CV685, appealing the decision of the hearing officer. The plaintiff cross-appealed. On August 30, 2000, the court consolidated the Board's appeal with the plaintiff's action for attorney's fees. On January 26, 2001, the parties agreed to withdraw their substantive appeals. Moreover, the parties have stipulated, in the scheduling order, that this matter is susceptible of resolution through motions for summary judgment.

tiff's motion for additional fees and costs.[2] For the reasons set forth below, the plaintiff's motions for summary judgment (**docket no. 29**) and additional costs and fees (**docket no. 39**) are **DENIED,** and defendant's motion for summary judgment (**docket no. 24**) is **GRANTED.**

## II. SUMMARY JUDGMENT STANDARD

Rule 56(c) of the Federal Rules of Civil Procedure states, in pertinent part, that "the motion [for summary judgment] shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to summary judgment as a matter of law." In *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986), the Court stated that "the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery upon motions, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." All ambiguities must be resolved and all inferences drawn in favor of the party against whom summary judgment is sought. *See Eastway Constr. Corp. v. City of New York,* 762 F.2d 243, 249 (2d Cir.1985), *cert. denied,* 484 U.S. 918, 108 S.Ct. 269, 98 L.Ed.2d 226 (1987).

"While genuineness runs to whether disputed factual issues can 'reasonably be resolved in favor of either party,' ... materiality runs to whether the dispute matters, i.e., whether it concerns facts that can affect the outcome under the applicable substantive law. . . . A reasonably disput-ed, legally essential issue is both genuine and material and must be resolved at trial." *Graham v. Henderson,* 89 F.3d 75, 79 (2d Cir.1996) (citations omitted).

## III. FACTS

Based upon the submissions of the parties, the court finds the following facts. At the time this action was initiated in 1994, the plaintiff, P.O., was a 14 year-old student entering ninth grade at Greenwich High School in Greenwich, Connecticut. The defendant, Greenwich Board of Education ("Board"), operates Greenwich High School.

In June of 1994, after an evaluation conducted by the Board, the Board classified P.O. as having a learning disability due to a significant discrepancy between P.O.'s written language achievement and verbal ability scores.[3] During the eighth grade at Eastern Middle School ("Eastern"), which was the 1997–98 school year, the Individualized Educational Program ("IEP") provided services for P.O. in a "resource room" and for occupational therapy for thirty minutes once every four weeks.

During the months of November, 1997, and January, 1998, the Board conducted an educational evaluation for the purposes of meeting the statutory requirement of a triennial evaluation. In the summary of the report, the evaluator stated that P.O.'s "reading skills were average as was narrative writing, but expository and persuasive written skills were weak. Cueing did not significantly improve [P.O.'s] performance and, therefore, continued direction in written expression skills was required." *See* Due Process Hearing Final Decision and Order [hereinafter "Decision and Order"] at 5–6. The evaluator also found weakness

---

**2.** The plaintiff seeks a total of $145,121.28 for expended attorney's fees and costs.

**3.** The parties agree that P.O.'s particular learning disability is a non-verbal disability.

in word finding and verbal oral expression. In addition, the evaluator made recommendations for strategies for P.O., his mainstream teachers, and his parents. Based upon the December 18, 1997 speech and language evaluation, the evaluator concluded that it was not necessary for P.O. to have speech and language services.

During a Planning and Placement Team (PPT) meeting in January of 1998, P.O.'s mother requested that P.O. be exited from the resource room and that his IEP goals be integrated in the regular education classroom. This dispute, however, was later resolved by the parties at the March 5, 1998 PPT meeting. During that meeting, the parties determined a new role for the special education teacher and a new function of the resource room. In addition, a portfolio system was to be implemented to help P.O. assess and evaluate his work. The resource room teacher and resource room time was to be used to teach P.O. how to use the portfolio system. The system was in use in the resource room for the remainder of the school year and, while the mother thought it was successful, she would have preferred to see it also be used in P.O.'s mainstream classes.

In May of 1998, P.O. was completing eighth grade at Eastern. On May 22, 1998, a PPT meeting was held to plan P.O.'s program at Greenwich High School for the 1998–1999 school year. This meeting resulted in an IEP which called for P.O. to attend the resource room for three periods during each eight-day cycle.

On or about June 9, 1998, P.O.'s mother requested that the IEP should incorporate P.O.'s triennial evaluation. The parties were unsuccessful in their attempts to incorporate the triennial evaluation into the IEP. Shortly thereafter, on July 24, 1998, P.O.'s parents filed for due process, requesting that the evaluation be incorporated in the IEP for 1998–1999. On August 6, 1998, P.O.'s parents submitted the prescribed Prehearing Conference Statement of Issues, which included a request for removal of P.O. from the resource room, modifications and adaptations in the classroom, and tutoring in reading to address the deficiencies noted in the triennial evaluation.

In September, 1998, P.O. began ninth grade at Greenwich High School and was assigned to the resource room. However, on August 25, 1998, P.O.'s mother wrote the principal of the high school withdrawing permission to have P.O. receive services in the resource room. At the September 17, 1998 due process hearing, an interim agreement was entered into the record removing P.O. from the resource room.[4] The parties revised the IEP to include this agreement at the PPT meeting held on September 18, 1998.

During a further PPT meeting held on October 22, 1998, the IEP was modified to include a portfolio system for both assessment and as a teaching strategy in the regular educational setting.[5] The mother agreed to the IEP with the exception that she wanted an occupational therapy consult.

On November 13, 1998, the due process hearing was reconvened. The hearing officer identified several new issues concern-

---

**4.** The agreement also approved a consultative model for special education with the student and the special education teacher meeting for two fifteen minute blocks per eight day cycle and that the time previously scheduled in the resource room would be scheduled in the learning center. In addition, the parties agreed that the special education teacher would consult with P.O.'s mainstream teachers for thirty minutes per cycle.

**5.** The IEP set forth five goals and twenty-four short term objectives.

ing P.O.'s educational program and the parties agreed that these issues would be heard by the officer if they were not resolved by the parties at a scheduled PPT meeting. In particular, one issue the parties were in disagreement was the implementation of the portfolio system.

Over the course of the due process hearings for the 1998–1999 IEP and related issues, the parties were attempting to prepare an IEP for P.O. that would cover the 1999–2000 school year. The parties' attempts were unsuccessful and, on September 7, 1999, P.O.'s parents filed for supplemental due process. At the September 23, 1999 hearing, the parents moved to enlarge the scope of the hearing to include P.O.'s programs for the 1999–2000 school year. The hearing officer granted the parents' motion.

In her written decision, the hearing officer framed the issues as follows:

1. Was the student provided with appropriate aids and supports in light of his disabilities to receive a free and appropriate public education during the 1998–1999 school year? [6]

2. Would the employment of an independent consultant to design a structured learning program, to train teachers in the implementation of that program, to monitor the student's performance in meeting IEP goals, to attend and report to PPT meetings, and to serve as a liaison between the Board and the parents have been an appropriate aid or service?

3. Was the portfolio system agreed by the PPT implemented by the Board?

4. Would providing an extended day program to provide the student tutoring in reading be an appropriate aid or service?

5. Would embedding speech and language services in the student's mainstream education be an appropriate aid or service?

6. Has the Board met the legal requirements to periodically assess the student's performance against his IEP goals?

7. Are the parents entitled to reimbursement for moneys they have spent:

   a. for tutoring in reading that began in September 1998 and is still continuing;

   b. for two tutors in language arts services during the summer of 1997; one working with Greek and Latin word roots and written language and the other working on pre-algebra to give the student some background before he started algebra in the fall.

8. Is the IEP for the 1999–2000 school year appropriate?

The hearing officer found for the Board on seven of the eight issues holding that: (1) the Board provided P.O. with appropriate aids and supports in light of his disabilities to receive a free and appropriate public education during the 1998–1999 school year; [7] (2) the employment of an indepen-

---

**6.** Regarding this issue, the hearing officer noted that "[t]he appropriateness of the 1998–1999 IEP, as amended in October of 1998[,] is not the issue of this proceeding. Nor are there any doubts that the parents, through the mother[,] were active participants in its promulgation. What is at issue is the implementation of that IEP." Decision and Order at 24.

**7.** The hearing officer noted that because the Board provided P.O. with a free and appropriate education it was not required to provide P.O. with the services set forth in the parents' statement of issues.

dent consultant was not warranted;[8] (3) there was no agreement by the PPT to implement a specific portfolio model; (4) the parental request for an extended day for tutoring should be denied; (5) the Board had met its legal requirement to periodically assess P.O.'s performance against his IEP goals; (6) the parental request for reimbursement for the three tutors should be denied; and (7) the parental request for embedding speech and language services in P.O.'s classroom should be denied. The hearing officer found, however, that P.O. was not receiving a free appropriate public education ("FAPE") for the 1999–2000 school year (as of the date of the close of the hearing).

## IV. DISCUSSION

The issues before the court are (1) whether P.O. was the prevailing party in the administrative proceeding and is thus entitled to attorney's fees and (2) if so, the amount of attorney's fees that should be awarded.

The IDEA creates a statutory scheme for monitoring a disabled child's educational progress by which both the school Board and the parents or guardian of the child are active participants. *See Mrs. M. v. Bridgeport Bd. of Ed.*, 96 F.Supp.2d 124, 128 (D.Conn.2000). As such, the parents and the school Board meet annually to discuss an IEP for the child, pursuant to 20 U.S.C. § 1414(d)(4)(A)(i). *See M.C. v. Voluntown Bd. of Ed.*, 226 F.3d 60, 62–63 (2d Cir.2000). Should the parents disagree with this IEP, they are entitled to a due process hearing with the state or local

agency challenging the educational body's decision. *See id.* Once the parents have exhausted their state remedies, they may seek review of any adverse decision in state or federal court. *See id.*

## "PREVAILING PARTY" ANALYSIS

In addition to the remedies discussed above, should the parents achieve a satisfactory result in the administrative level, they may petition the court for an award of attorney's fees. *See G.M. v. New Britain Bd. of Ed.*, 173 F.3d 77, 80 (2d Cir. 1999). Specifically, 20 U.S.C. § 1415(i)(3)(B) provides that:

> [i]n any action or proceeding brought under this section, the court, in its discretion, may award reasonable attorney's fees as part of the costs to the parents of a child with a disability who is the prevailing party.

20 U.S.C. § 1415(i)(3)(B). The legal standard for determining "prevailing party" status in an IDEA attorney's fees action is the same as that governing the award of attorney's fees in civil rights litigation pursuant to 42 U.S.C. § 1988. *See Angela L. v. Pasadena Indep. Sch. Dist.*, 918 F.2d 1188, 1193 (5th Cir.1990) (citing legislative history of IDEA); *Y.O. v. New Britain Bd. of Ed.*, 1 F.Supp.2d 133, 138 (D.Conn.1998)(prevailing party inquiry under IDEA is the same as that under § 1988); *D.H. v. Ashford Bd. of Ed.*, 1 F.Supp.2d 154, 159 (D.Conn.1998) (same). Under this standard, a party "may be considered a 'prevailing party' for attorney's fees purposes if they succeed on any significant issue in litigation which achieves

---

**8.** However, the hearing officer did order that the parties shall agree on a facilitator to serve in a variety of capacities. In particular, some of the responsibilities of the facilitator included the following: (1) to observe and participate at all PPT meetings and to issue a report to the participants with recommendations concerning the meeting; (2) to structure the meetings including the agenda and making sure that the positions of the parties are clearly understood and addressed in a constructive fashion; (3) to review the minutes of the PPT meetings; and (4) to confer with the parties in an effort to share their respective concerns with each other.

some of the benefit the parties sought in bringing the suit." *G.M. v. New Britain Bd. of Ed.*, 173 F.3d at 81 (internal quotation marks omitted)(quoting *Texas State Teachers Ass'n v. Garland Indep. Sch. Dist.*, 489 U.S. 782, 789, 109 S.Ct. 1486, 103 L.Ed.2d 866 (1989)). Thus, the linchpin of the analysis is to determine the degree of success obtained by comparing the relief sought by the plaintiff and the relief actually obtained. *See Christopher P. v. Marcus*, 915 F.2d 794, 804 (2d Cir.1990).

■ The Supreme Court has explained that for a plaintiff to successfully claim prevailing party status, he must demonstrate that: (1) he obtained relief on a significant claim in the litigation; (2) such relief effected a material alteration in his legal relationship with the defendant; and (3) the alteration is not merely technical or de minimis in nature. *See Texas State Teachers Ass'n v. Garland Indep. Sch. Dist.*, 489 U.S. at 791–93, 109 S.Ct. 1486; *Mr. J v. Bd. of Ed.*, 98 F.Supp.2d 226, 239–240 (D.Conn.2000); *D.H. v. Ashford Bd. of Ed.*, 1 F.Supp.2d at 159. The court is to apply a "generous formulation" of this test, and should not require "perfect congruence between the relief requested and the relief obtained." *G.M. v. New Britain Bd. of Ed.*, 173 F.3d at 83.

■ Most recently, the Supreme Court decided *Buckhannon Board and Care Home, Inc. v. West Virginia Department of Health and Human Resources*, 532 U.S. 598, 121 S.Ct. 1835, 149 L.Ed.2d 855 (2001), which clarified the term "prevailing party." The decision held that, to be a prevailing party, one must either secure a judgment on the merits or be a party to a settlement agreement that is expressly enforced by the court through a consent decree. *Buckhannon*, 121 S.Ct. at 1840. The Court further held that results obtained without such an order did not supply a basis for an award of attorney's fees because "[a] defendant's voluntary change in conduct ... lacks the necessary judicial *imprimatur*" to render the plaintiff a prevailing party. *Id.* The Court expressly rejected the catalyst theory as a predicate for recovering attorney's fees because "[i]t allows an award where there is no judicially sanctioned change in the legal relationship of the parties." *Id.*

■ Although the hearing officer ruled in the Board's favor on the majority of issues at the due process hearing, P.O.'s parents contend nonetheless that they were prevailing parties. In support of their contention P.O.'s parents claim that they received favorable results on "the issues of the family's request for an independent facilitator and the family's concern about the Board providing FAPE during the 1999–2000 school year." Plaintiff's Memorandum in Support of Motion for Summary Judgment [hereinafter Pf.'s Mem. in Support of Mot. Summ. J.] at 11. In addition, the parents contend that, under the catalyst theory, they are prevailing parties. *Id.* at 24. The parents purport that the Board entered into the September 1998 interim agreement ("Agreement") which, *inter alia*, removed P.O. from the resource room as a result of their filing for due process. Despite the parents' claim that they achieved an "excellent result" through the due process hearing, the record does not support this contention.

## A. Issues 1–7 of the Due Process Hearing

The administrative proceedings encompassed twenty-five days of hearings and lasted approximately some nineteen months after P.O. requested due process. Although the hearing officer identified eight issues for adjudication, the parties have different views as to the central focus of the due process hearing and who was prevailing. P.O.'s parents contend that

the primary issue before the hearing officer was "whether special education services should be provided within the regular education setting." *Id.* at 24. On the other hand, the Board argues that the "ultimate legal issue in [the] due process hearing [was] whether the Board provided a free and appropriate educational program" to P.O. Defendant's Memorandum in Support of Motion for Summary Judgment [hereinafter Df.'s Mem. in Support of Mot. Summ. J.] at 32. The Board's argument is more persuasive.

As the Board correctly points out, the hearing officer ruled in favor of the Board on the ultimate issue: the Board provided P.O. with a free and appropriate education for the 1998–1999 school year. *See* Decision and Order at 29. In addition, the hearing officer also decided in the Board's favor on issues 1–7 which all related to whether P.O. received a FAPE. *Id.* at 41.

P.O.'s parents brought this action challenging the 1998–1999 IEP. As the hearing officer correctly concluded, the appropriateness of the IEP was not the issue of the proceedings. Instead, the hearing centered on whether the Board was implementing the IEP pursuant to the standards of the IDEA. After reviewing the relevant law, the hearing officer found that P.O. received an educational benefit from the 1998–1999 IEP, noting that P.O. "made very real progress and earned more than just passing grades." *Id.* at 26. In addition, the hearing officer found that, based upon the evidence presented, P.O. made progress on his IEP goals and objectives for the 1998–1999 school year.[9] *Id.* at 29. Thus, on issue one, the hearing officer concluded that the Board provided P.O.

with appropriate aids and supports in light of his disabilities to receive a free and appropriate public education during the 1998–1999 school year.

Despite the hearing officer's clear and concise order, P.O.'s parents contend that the officer ruled in their favor on the second issue of whether the Board should employ an independent consultant. The parents argue that "there can be little doubt that the facilitator ordered by the hearing officer met the request of the family for an outside consultant." Pf.'s Mem. in Support of Mot. Summ. J. at 23. The court disagrees.

The hearing officer examined the parents' request regarding an independent consultant and determined that it was contrary to the provisions of the IDEA. The officer stated that "it is clear from [the parents'] Proposed Order that the parents seek a consultant to be the ultimate authority as to the IEP. A hearing officer cannot strip the PPT of its mandatory authority and responsibility and delegate it to a consultant." Decision and Order at 38. Moreover, the hearing officer found that an independent consultant was not necessary in order for P.O. to receive a FAPE. The officer noted "the parents want a consultant of their choice to do extensive training of school staff responsible for [P.O.'s] education. There has been no showing that such training is necessary for the 1999–2000 school year. Further, there is nothing in the record that would indicate that the parental choice of a consultant should be imposed" on the Board. *Id.* at 39.

Although the hearing officer did order a facilitator, it is clear that the facilitator's

---

9. In particular, the hearing officer noted that "the special education teacher determined that not only had [P.O.] made progress but also that he met the overwhelming majority of his goals and objectives. There was no evidence that the teachers were not telling the truth. This cannot be discounted. The parents have only submitted their doubts." *Id.* at 29.

perceived role was a liaison between the parents and the Board due to the deterioration of the parties' relationship. *Id.* at 40. The hearing officer's decision leaves little doubt that she denied the parents' request of an independent consultant. Moreover, the record is ultimately void of any indication that the hearing officer intended the facilitator to serve the same functions as those requested by the parents of an independent consultant.

The hearing officer also ruled against P.O.'s parents on issue three. The hearing officer found that P.O.'s teachers had implemented a portfolio system. The officer noted, however, that there was never an agreement between the parties as to the proper methodology or the type of portfolio system.[10] The hearing officer ruled that "there was nothing in the IEP that set out the formal components of the portfolio system and[,] therefore, there can be no finding that the way it was used by [the Board] was a variance from the IEP." *Id.* at 27.

The hearing officer also denied P.O.'s parents' request regarding issues four through seven. The hearing officer noted that, although there had been parental concern expressed pertaining to P.O.'s reading over the years, an extended school day should not be used for reading. In addition, the hearing officer found that P.O.'s parents failed to introduce any evidence to warrant the conclusion that P.O. required extra reading assistance in order to have a FAPE. Similarly, the parents also failed to introduce any evidence to support their assertion that P.O.'s mainstream classes should be embedded with speech and language services. Regarding issue six, the hearing officer concluded

that the Board met the legal requirements to periodically assess P.O.'s performance against his IEP goals. Lastly, the hearing officer held that there was no legal or factual basis to award reimbursement for the three tutors that the parents hired for P.O.

## B. The September 1998 Agreement

On April 27, 2001, P.O.'s parents filed the present motion for summary judgment claiming that they were prevailing parties and, therefore, entitled to attorney's fees and costs. The parents' claim was, in part, supported by their argument that the Board entered into the September 1998 interim agreement as a result of their filing for due process. The court disagrees.

■ P.O.'s parents' claim is premised on the catalyst theory. However, on May 29, 2001, the United States Supreme Court rejected the catalyst theory as a basis for recovery of attorney's fees pursuant to federal statutes allowing the award of fees to prevailing parties. *Buckhannon Board and Care Home, Inc. v. West Virginia Department of Health and Human Resources*, 532 U.S. 598, 121 S.Ct. 1835, 149 L.Ed.2d 855 (2001). In rejecting the catalyst theory the Court held that, to be a prevailing party, one must either secure a judgment on the merits or be a party to a settlement agreement that is expressly enforced by the court through a consent decree. *Buckhannon*, 121 S.Ct. at 1840.

Here, it is clear that the relief the Agreement gave P.O. was not the result of a judgment on the merits. Nor could this court construe the Agreement as a settlement agreement that is expressly enforced by the court through a consent decree.[11]

---

**10.** The portfolio system that was suggested by P.O.'s mother was never agreed to by the parties at a PPT meeting.

**11.** A consent decree is an equitable order binding two or more consenting parties. The court does not believe that the mere reading of the agreement into the record by the hear-

Instead, the record indicates that the parties reached an interim agreement outside of the due process hearing regarding the resource room. Further, although the Agreement was entered into the record at the September 17, 1999 hearing, the court concludes-in the words of the *Buckhannon* Court—that the Board's "voluntary change in conduct ... lack[ed] the necessary judicial *imprimatur*" to render P.O.'s parents prevailing parties.

Moreover, it is not entirely clear that the Board even had a "voluntary change in conduct" by entering into the Agreement. It is undisputed that, in May of 1998, P.O.'s parents accepted and agreed to the 1998–1999 IEP which included resource room services for P.O. On May 28, 1998, the summary of the May 22, 1998 IEP meeting was mailed to P.O.'s mother with a copy of the 1998–1999 IEP. On June 9, 1998, and July 8, 1998, P.O.'s mother wrote to the Board seeking modification of P.O.'s 1998–1999 IEP. Although it is unnecessary to determine whether the Board or P.O.'s parents were responsible for not resolving this dispute through another IEP meeting, it is clear that P.O.'s parents filed for due process before the parties could discuss this issue at an IEP meeting under the IDEA guidelines set forth in 20 U.S.C. § 1414. The court finds that the record fails to establish that the Board previously opposed any of the relief that P.O. received through the Agreement. Moreover, it is highly likely that P.O. would have received the same benefits that he received through the Agreement had another IEP meeting taken place. Under these circumstances, it would be inequitable to award attorney's fees to P.O.'s parents

under the theory that they were prevailing parties on this issue.

### C. The 1999–2000 IEP

P.O.'s parents also claim they are prevailing parties based upon the hearing officer's statement that P.O. "was not provided with a FAPE for the 1999–2000 school year." The court disagrees.

By way of relief on the 1999–2000 IEP issue, the parents sought the following: (1) an independent evaluation at public expense to determine P.O.'s current level of functioning on his 1998–1999 IEP goals and to set baseline data for 1999–2000 IEP goals, (2) the appointment of an independent consultant with authority as a final arbiter to train and support teachers and to develop the IEP and the educational program (including monitoring its implementation), (3) compensatory education in services and reimbursement, and (4) various other relief. The parents did not, however, succeed on any of their requests. After comparing the relief sought by the parents and the relief actually obtained by them, the court concludes that, notwithstanding the hearing officer's statement, the parents failed to obtain significant relief as a result of the litigation.

Although the parents claim that the hearing officer ruled in their favor by ordering certain evaluations, the officer's decision *only* requires that this occur in the event that the Board had not already conducted such evaluations. Therefore, it is possible that the Board already conducted the necessary evaluations prior to the issuing of the hearing officer's decision. However, there is nothing in the record to indicate whether or not the Board had already met the requirements enumerated

---

ing officer established a consent decree between the parties. *But see Jose Luis R. v. Joliet Township H.S. District 204*, No. 01C4798, 2001 WL 1000734 (N.D.Ill. Aug.29,

2001) (holding parties agreement was a consent decree solely because hearing officer read it into administrative record).

by the hearing officer. Nonetheless, any relief the parents may or may not have received from the evaluations fails to elevate the parents to prevailing party status. Even if the hearing officer's decision was seen as resulting in some improvements in P.O.'s 1999–2000 IEP, it would not be appropriate to award attorney's fees where the changes ordered were de minimis in the context of the parents' broader goals in this case. *See Texas State Teachers Ass'n, supra,* 489 U.S. at 792, 109 S.Ct. 1486 ("[T]he plaintiff cannot qualify as a 'prevailing party' if his 'success on a legal claim can be characterized as purely technical or de minimis . . . .' ").

In addition, even if the hearing officer ruled in the parents' favor regarding the 1999–2000 IEP, the parents failed to establish that this was a significant issue in the litigation which achieved some of the benefit that they sought in filing for due process. P.O.'s parents began the underlying litigation by filing for due process on July 24, 1998. At that point in time, the ultimate issue was whether the Board was providing P.O. with a FAPE for the 1998–1999 school year. Moreover, over the course of the due process hearings, the hearing officer narrowed the issues surrounding the IEP for the 1998–1999 school year and articulated them as issues 1–7 in her decision. All of those issues were decided in favor of the Board. In addition to those claims, the parents raised a variety of other issues, including the resource room, that were resolved by the parties in their Agreement. However, when the parents originally filed for due process, the 1999–2000 IEP was not in dispute. By the parents' own admission, the scope of the hearing did not encompass the 1999–2000 school year until September 23, 1999. Therefore, the court is unpersuaded the 1999–2000 FAPE was a significant issue when the parties originally filed for due process.

■ Even if the court was to find that P.O.'s parents were prevailing parties under the most generous formulation of this test, the parents would still not be entitled to attorney's fees in this case. An attorney's fees award rests within the sound discretion of the district court because the court is particularly well-qualified to make the partially subjective findings necessary for an award of fees and to perform the balancing of equities that is an integral part of the proceeding for an award of fees. In addition, 20 U.S.C. § 1415(i)(3)(F)(i) mandates that a court shall reduce attorneys fees if the parent, during the course of the action or proceeding, unreasonably protracted the final resolution of the controversy.

■ In the present case, with regard to the 1999–2000 IEP issue, the court finds that P.O.'s parents unreasonably protracted the resolution of the controversy. The hearing officer specifically noted the following:

> It was without question that the mother did not agree to any implementation of any goals and objectives as discussed at the September 1, 1999 IEP meeting. It was perfectly clear that she did not want anything new to happen until her concerns about the 1998–1999 IEP were addressed. . . . While the goals discussed at the PPT on September 1, 1999 were not agreed to by the parents[,] it is apparent that the problem was not with the goals themselves, but with the fact that the parents did not accept that the previous goals and objectives were met. They then refused to consider new goals and objectives without being satisfied as to the previous year's progress. *It was unfortunate, counterproductive and unnecessary that the parents took that position.* There were goals and objectives on which the parties could have agreed,

and at least start to move forward as a team in the beginning of the school year. The goals and objectives proposed by the Board did not rely. on the student's performance on his prior IEP and did address needs of the student that the parent had expressed. In fact[,] the goal and short-term objectives concerning written expression were the same as seen by [P.O.'s doctor] before his testimony and that met with his approval. The parents concern about a self-advocacy and the expansion of the written expression goal were subject to agreement and could well have been resolved if put forward.

Decision and Order at 33–34 (emphasis added). The record demonstrates that the hearing officer found that the 1999–2000 IEP was deficient. Based upon this finding, the officer concluded that P.O. did not receive a FAPE for 1999–2000. However, after reviewing the administrative record below and the submissions of the parties, it is clear that the parents' refusal to negotiate the 1999–2000 IEP was the predominate factor for the deficiencies in the 1999–2000 IEP. Thus, even assuming P.O.'s parents were prevailing parties with respect to the claim raised as to the 1999–2000 IEP, it would be unjust to award *any* fee because, based upon the hearing officer's conclusions, the parents failed to participate in good faith in developing an IEP for the 1999–2000 school year.

The court does not doubt P.O.'s parents desire to seek the best educational benefit for their child. In addition, the court recognizes it must be frustrating at times to be the parents of a child with special needs. However, the court also recognizes the arduous task that school boards encounter as they try to accommodate learning disabled students with the best educational aids and supports. In this particular case, the Board was placed in a difficult position by P.O.'s parents during the implementation of the 1999–2000 IEP. While the court acknowledges that the parents' frustration was undoubtedly attributed to what they perceived as resistance from the Board, at some point in time this frustration became ·an obstruction in achieving a suitable IEP for the 1999–2000 school year. Although the IEP process may have created a frustrating situation, it does not entitle P.O.'s parents to attorneys fees. To award fees and costs under the circumstances of this case would be unconscionable.

## V. CONCLUSION

Under these circumstances, it is apparent that P.O.'s parents were not "prevailing parties" due to their limited success on the merits and for unreasonably protracting a resolution. Thus, the plaintiff's motions for summary judgment and additional costs and fees are denied, and ·defendant's motion for summary judgment is granted.

Either party may seek review of this report and recommendation as provided in 28 U.S.C. § 636(b). 28 U.S.C. § 636(b) (written objections to recommended ruling must be filed within ten days of service of the same); *see also* Fed. R. Civ. Pro. 6(a), 6(e), & 72; and Rule 2 of the Local Rules for United State Magistrate Judges (D.Conn.). **Failure to object in a timely manner may preclude further review.** *See Small v. Secretary of Health and Human Servs.*, 892 F.2d 15, 16 (2d Cir.1989).

**IT IS SO ORDERED.**

Dated at Hartford, Connecticut this 26th day of February, 2002.